STATE of Minnesota, Respondent,

v.

Richard Mark SWAIN, Appellant.

No. 47524.

Supreme Court of Minnesota.

June 23, 1978.

---

C. Paul Jones, Public Defender, Robert Oliphant, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary Flakne, County Atty., Vernon E. Bergstrom, David W. Larson and Lee Barry, Asst, Minneapolis, for respondent.

Heard before YETKA, SCOTT and WAHL, JJ., and considered and decided by the court en banc.

YETKA, Justice.

Defendant was found guilty of first degree murder by a jury in Hennepin County District Court and is appealing from the judgment entered on the jury verdict. We affirm the conviction of murder but reduce the degree from first to second.[1]

Defendant, Richard Swain, lived in Golden Valley, Minnesota, with his mother, Betty Swain. Defendant was arrested on April 22, 1976, and charged by complaint with murder in the second degree in the death of Betty Swain. He was indicted by a Hennepin County Grand Jury on a charge of murder in the first degree on April 27, 1976. Minn.St. 609.185 provides, in part:

"Whoever does either of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

"(1) Causes the death of a human being with premeditation and with intent to effect the death of such person or of another; * * *."

On Sunday, April 18, 1976, Betty Swain had Easter dinner at the home of a friend. She left home at about 11 a. m. that morning. She picked up a friend, Helen Norris, and the two did some errands. Ms. Swain and Ms. Norris arrived at the home of Dora Coleman at 4 or 4:30 p. m. The people at the Coleman home drank some alcoholic beverages, ate supper, and played bridge. Ms. Swain and Ms. Norris left at 9 or 9:15 p. m. Ms. Swain left the Norris residence at about 9:45 p. m. and was never heard from again. Ms. Swain had been driving a green Chevrolet station wagon and had been wearing her glasses that evening. She wore a gray or black blouse with a white pattern and charcoal gray slacks with a blue thread pattern.

When Ms. Swain did not appear at her job the next morning, one of her coworkers, Richard Hans, called Ms. Norris and asked if she knew Ms. Swain's whereabouts. Ms. Norris went to the Swain residence, walked around the house, and knocked on several doors, but no one answered. While on the grounds, she found a pair of glasses which she identified as those worn by Ms. Swain the previous night.

Later that day Ms. Norris returned to the Swain home and went inside with Richard Hans. They did not find anything unusual, but were unable to find the clothing that Ms. Swain had been wearing the previous evening. The two called the defendant at his place of work; the defendant stated he assumed his mother was at work. The Golden Valley Police were then called by Mr. Hans and Ms. Norris.

The police went to the defendant's home at least three times on April 19, 1976. At that time he filed a missing-persons report and stated that he did not know the make or color of his mother's car. Defendant stated that he had stayed up watching television until about 1 a. m. when he went to bed.

On Thursday, April 22, 1976, the body of Betty Swain was found in Hopkins, Minnesota, about 5.4 miles from the Swain home. The body was found in a locked green station wagon. The doctor who performed the autopsy testified that death occurred between 9:45 p. m. and midnight on April 18, 1976. He testified that Ms. Swain died as a result of brain injuries from seven blows to the back of her head. The first two blows were parallel to each other, while the next

1. Pursuant to Rule 29.02, subd. 13, Rules of Criminal Procedure.

five were perpendicular to the first two and were probably delivered after the first two. Pieces of polyethylene were discovered in the head wound indicating that the weapon was covered with plastic. The clothes on Ms. Swain's body were different from those she had worn the day she was last seen.

Sometime during the day on April 22, 1976, a benzidine test was performed on the glasses found by Ms. Norris.[2] They tested positive for blood. Based upon that test and the circumstances of Ms. Swain's death, the police applied for and were issued a warrant to search the Swain residence for, among other things:

> "Any blood stained items to include clothing."

Pursuant to the warrant a 3-day search of the defendant's house was conducted. A benzidine test was used to detect the presence of blood in various places in and around the house. After a positive test on a driveway stain and on several other spots in the garage, defendant was arrested. Some stains on the knees of the blue jeans which defendant was wearing also gave a positive benzidine test.

During the search, virtually all parts of the house were tested by means of the benzidine test. Nine of the numerous stains which gave positive benzidine test results were ultimately found to be blood type O, the same type as Betty Swain's blood. The blood on the left knee of the defendant's jeans was found to be type O. Three of the stains were found to be type A, the same as defendant's. The other tests were inconclusive. Among the items found to be stained with type O blood were a stain under a recreation room rug,[3] debris from the recreation room, and paper towels from

the garage. Those containing type A blood were a couch and defendant's tennis shoe. Although it could not all be further identified, positive benzidine tests indicated blood in other areas of the basement, garage, recreation room, and upstairs in the attic entry, bedrooms, and bathrooms.

Just before the search began defendant asked a police officer who had come to secure the house if he was there to make sure defendant did not burn any rags. Defendant said that he was concerned that some hydrochloric acid in the house and a double bladed knife which he owned might be illegal and would be discovered. During the search defendant described to another officer what he called "little pranks" which he and a coworker had thought of. Defendant told the officer that perhaps he (defendant) had hit his mother on the head and dropped her from the roof. Defendant later told the officer that an ax with hair and blood would be found in the garage. He stated that it was catfish blood.[4]

No murder weapon was found; no identifiable fingerprints were found at the murder scene. The clothing worn by Ms. Swain on April 18, 1976, was never recovered. At trial the state attempted to connect defendant with the crime in an additional way: The state's final witness Robert Helmer, a former boarder with the Swains, testified that in the summer of 1975 he heard defendant come into his room after a fight with Ms. Swain. Defendant was in his bedroom "yelling" and "cussing" and "mad;" Ms. Swain was not present. Defendant was cutting paper with a pocket knife and was reported to have said, "I would like to kill her sometimes, get at her." This was the only threat heard by Helmer.

---

**2.** A benzidine test is a preliminary or field test which can indicate the presence of blood. When a suspected bloodstain is treated with a benzidine solution and hydrogen peroxide, the hemoglobin in the blood causes an immediate bright blue color reaction. The age of the blood is irrelevant; the test cannot distinguish human or animal blood, and further laboratory tests are necessary for this. Defense counsel was unable to substantially discredit the state's expert on the reliability of this test when used

by a trained observer. The test will detect one drop in 15 quarts of water.

**3.** The stain under the recreation room rug was moist and recognizable as blood. Apparently no other stains were identifiable without the benzidine test.

**4.** An ax was found in the Swain garage, but the benzidine test was negative indicating the absence of bloodstains.

On October 8, 1976, a pretrial mental competency examination of the defendant was ordered.[5] No express finding of competency was made by the trial court, and the issue was not raised again by defense counsel.

At the close of trial, the court denied defendant's motion to allow written instructions in the jury room. The trial court instructed the jury on first and second degree murder, but defendant's request for an instruction on first degree manslaughter and other lesser included offenses was denied. At the state's request, defense counsel was ordered not to comment on the prosecution's failure to call defendant's father as a witness.[6]

Defendant has raised the following issues:

1. Was the evidence sufficient to support the verdict of first degree murder?

2. Is testimony concerning an argument between a defendant and victim 10 months prior to an alleged first degree murder admissible to show defendant's state of mind?

3. Was the defendant entitled to an instruction on manslaughter in the first degree in an unwitnessed homicide?

4. Is a defendant entitled to have written instructions submitted to a jury at his request?

5. May the trial court prohibit defense counsel from commenting, in closing argument, on the prosecutor's failure to call defendant's father as a witness?

6. Where a search warrant specifically directs seizure of "bloodstained items" may the police conduct chemical tests for unseen blood residues throughout the house?

7. May the police search a house for 2 succeeding days pursuant to a single search warrant issued on one date?

8. Where a pretrial competency examination is ordered may a trial judge proceed to trial where the records reflect neither the fact of the hearing nor the outcome?

9. Was the defendant entitled to a change of venue on the basis of pretrial publicity?

(1) Sufficiency of the evidence.

In determining the sufficiency of the evidence this court must view the evidence in a light most favorable to the jury verdict and decide whether the jury could reasonably have found the defendant guilty of the crime charged. State v. Whelan, 291 Minn. 83, 189 N.W.2d 170 (1971); State v. Thompson, 273 Minn. 1, 139 N.W.2d 490 (1966), certiorari denied, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966). Where a conviction rests entirely upon circumstantial evidence, all the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt. State v. Pankratz, 238 Minn. 517, 531, 57 N.W.2d 635, 643 (1953). See, 10 Minnesota Practice, Jury Instruction Guides, CRIMJIG 3.05.

Defendant argues that the evidence was insufficient to show that he committed the act of killing his mother and that in any case it is insufficient to show premeditation and intent. He argues that the testimony about defendant's argument with his mother is too remote to be probative of his state of mind on April 18, 1976. He also argues that the circumstantial evidence was inconclusive in connecting defendant with his mother's death. He specifically cites the occurrence of type O blood in 42 percent of the population; the inconclusiveness of the testimony regarding time of death; failure to find fingerprints; and defendant's calm voice in a phone call on April 18. Finally, defendant argues that the nontime specific benzidine test could have revealed blood left in the house several years earlier.

The state argues that the defendant's connection with the crime is proved circumstantially by his opportunity, the presence

---

**5.** See, Rules 20.01 and 20.02, Rules of Criminal Procedure. The examination was requested by both the state and defendant.

**6.** Diane Swain, defendant's father, had undergone a sex change operation several years earlier.

of blood throughout the house, the estimated time of death, the extensive cleanup, the blood-type match on the knees of his jeans and his "hints" dropped to police officers. We find that there was adequate evidence for the jury to come to the conclusion that the defendant killed his mother in their residence. Probably the most damaging evidence is the presence of the type O stains in various places throughout the house and on defendant's jeans. The evidence on premeditation is more troubling. It involves an inference from testimony with slight probative value.

Minn.St. 609.18 defines premeditation as follows:

"For the purposes of sections 609.185 and 609.19, 'premeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission."

In *State v. Neumann*, 262 N.W.2d 426 (Minn.1978), this court restated prior holdings on premeditation in first degree murder prosecutions. *Neumann* and *State v. Martin*, 261 N.W.2d 341 (Minn.1977), reiterated the prior rule that a "plan" to commit first degree murder need not be formulated in any specific length of time and that premeditation may be inferred in part from the number of times a weapon is used.[7]

The state argues that the element of premeditation was proved by the defendant's prior threat to kill his mother, the fact that he attacked from behind, and repeated blows to the head. Defendant's threat 10 months earlier is of little probative value concerning his state of mind on the day of the murder. Likewise, the fact that Ms. Swain was struck from behind does not lead to the inference of planning. It is just as likely that she was struck impulsively as she turned her back.

■ In *State v. Hare*, 278 Minn. 405, 154 N.W.2d 820 (1967), certiorari denied, 391 U.S. 925, 88 S.Ct. 1823, 20 L.Ed.2d 663 (1968), the court held that the firing of a second and third shot into a police officer was sufficient to support a finding of premeditation.[8] In *State v. Martin, supra*, the court stated with regard to continued stabbing, including post mortem wounds:

"* * * While the brutality of the killing *alone might not be sufficient evidence of premeditation*, it certainly could be considered by the jury as supporting an inference that defendant premeditated to act as he did." 261 N.W.2d 345. (Italics supplied.)

None of the supporting circumstances present in other premeditation cases is present here. There is no evidence of prior planning, no evidence of arming for a rob-

---

**7.** In *State v. Hare*, 278 Minn. 405, 154 N.W.2d 820 (1967), certiorari denied, 391 U.S. 925, 88 S.Ct. 1823, 20 L.Ed.2d 663 (1968), the element of premeditation was proved by repeated shots fired into the policeman victim. In *State v. Martin*, 261 N.W.2d 341 (Minn.1978), the court used multiple stab wounds as evidence of premeditation.

**8.** The court set forth The Advisory Committee Comment, 40 M.S.A. p. 191, stating: "In 1959, Minn.St. § 619.08 was revised so that murder in the second degree, with certain exceptions, no longer carries a penalty of life imprisonment. With this change, substantial consequences in terms of possible punishment now turn on the meaning of the word 'premeditation.' *The definition in recommended § 609.18 undertakes to give this distinction some substance. Heretofore it has been largely without meaning.* All the time presently needed for premeditation or deliberation is that required to form the intent to kill. Thus the following instruction was sus-

tained in *State v. Prolow*, 1906, 98 Minn. 459, 108 N.W. 873:

"The 'premeditation may be formed at any time, moment or instant before the killing. Premeditation means thought of beforehand for any length of time, no matter how short. There need be no appreciable space of time between the intention of killing and the act of killing. They may be as instantaneous as the successive thoughts of the mind.'

"The recommended definition is directed at the calculated murder although the intention need not be to kill any specific person. Thus, arming oneself prior to a robbery expecting to kill if need be anyone obstructing the plans would be sufficient to come within the definition even though it may be hoped and anticipated that the need for killing would not occur." (Italics supplied.)

It thus appears that the legislature intended some greater distinctions between first and second degree murder than we have heretofore recognized.

bery, no evidence of actual assent. See, *State v. Neumann, supra.* Likewise, in *State v. Walker,* 306 Minn. 105, 235 N.W.2d 810 (1975), certiorari denied, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976), the court's conclusion that a prolonged severe beating supported inferences of premeditation and intent was bolstered by evidence of prior robbery planning and desire to prevent identification. Only *State v. Hare, supra,* appears to infer premeditation solely from the number of times a weapon is used. We believe that death from a series of blows cannot, alone, support a finding of premeditation in a first degree murder prosecution.[9]

The jury could have found that Ms. Swain came home, changed her clothes, and was killed in the house. Because defendant was the only person at home (at least according to this record), he could be the only person to have committed the murder. This is corroborated by the type O bloodstains on his jeans. The evidence of premeditation is, however, insufficient to support a conviction for the kind of killing intended by the first degree murder statute. Thus, we affirm the conviction of murder but reduce the degree from first to second.

(2) Admission of testimony concerning defendant's prior threat.

Defendant argues that the testimony concerning the argument between him and his mother some 10 months before her death was irrelevant and should have been excluded. He points to its remoteness in time, the fact that it was a single occurrence, and the fact that it occurred while defendant was angry. Because the state did not show defendant to be angry on April 18, he argues that it was not relevant.

The state argues that Helmer's testimony shows several arguments and thus a course of conduct and mental attitude toward his mother. The state cites *State v. Rediker,*

214 Minn. 470, 8 N.W.2d 527 (1943), and *State v. Diamond,* 308 Minn. 444, 241 N.W.2d 95 (1976). See, also, *State v. Boyce,* 284 Minn. 242, 170 N.W.2d 104 (1969).

In *State v. Rediker, supra,* this court held that testimony concerning a course of conduct between a husband and wife showing constant threats, abuse, and frequent beatings was admissible where the wife-victim was found with bruises on her body. In *State v. Diamond, supra,* the evidence admitted was a series of threats with weapons made by the defendant on the victim over several years. In the present case, there was no direct threat, but rather an expression of desire to a third person. There is evidence of frequent arguments, but there is no evidence in the present case of frequent threats. The testimony concerning this incident does not appear to be within the contemplation of a "course of conduct" as used in prior cases. Although it may arguably bear on intent, the probative value of this evidence is quite weak when considered on the element of premeditation.

While evidence of prior relations between a defendant and victim may be admissible, 1 Wharton, Criminal Evidence, (13 ed.) § 198, probative value diminishes with remoteness from the act. The trial court has wide discretion in matters concerning the relevancy of evidence. Rule 403, Rules of Evidence; *Renne v. Gustafson,* 292 Minn. 218, 194 N.W.2d 267 (1972). The admission of this evidence was not an abuse of discretion because it bore on intent. We consider it too remote by itself, however, to bear on premeditation.

(3) Lesser included offenses.

Prior to trial defendant requested that the jury be instructed on several lesser included offenses.[10] The trial court ruled that it would only submit the offenses of first and second degree murder. Murder in the second degree is defined by Minn.St. 609.19 as follows:

---

**9.** Cf., *State v. Keaton,* 258 Minn. 359, 104 N.W.2d 650, 86 A.L.R.2d 649 (1960), which holds that premeditation cannot be inferred from the fact of the killing alone.

**10.** The lesser included offenses were murder in the second degree, murder in the third degree, manslaughter in the first and second degree, aggravated assault, and simple assault.

"Whoever causes the death of a human being with intent to effect the death of such person or another, but without premeditation, is guilty of murder in the second degree and may be sentenced to imprisonment for not more than 40 years."

Defendant renewed his motion at the close of the evidence. Defendant argues on appeal that he was entitled to an instruction on manslaughter in the first degree. Minn.St. 609.20(1) provides, in part:

"Whoever does any of the following is guilty of manslaughter in the first degree and may be sentenced to imprisonment for not more than 15 years or to payment of a fine of not more than $15,000, or both:

"(1) Intentionally causes the death of another person in the heat of passion *provoked by such words or acts of another* as would provoke a person of ordinary self-control under like circumstances * * *." (Italics supplied.)

The state argues that there is no evidence that defendant acted in the heat of passion or that he was provoked.

In *State v. Leinweber,* 303 Minn. 414, 228 N.W.2d 120 (1975), this court set forth five tests governing the submission of lesser included offenses.[11] The relevant principle from *Leinweber* is the following:

"(c) If the evidence adduced at trial would permit a finding of guilty of an included crime, defendant is entitled to appropriate instructions advising the jury of its power to return a verdict of guilty of the lesser offense." 303 Minn. 421, 228 N.W.2d 125.

*Leinweber* relied in part on Minn.St. 611.02 which ensures a defendant the presumption of innocence and provides:

" * * * when an offense has been proved against him and there exists a reasonable doubt as to which of two or more degrees he is guilty, he shall be convicted only of the lowest."

In *Leinweber* the defendant was charged in the death of his wife. The defendant testified that his shooting of his wife was accidental. This court, however, reversed the conviction of murder in the third degree in part on the ground that the trial court failed to give defendant's requested instruction on manslaughter in the first degree. The court held that evidence of prior vilification by the victim, an argument overheard just prior to the shooting and the victim's cursing at the defendant for 2 minutes before she died would have justified a heat of passion instruction despite the defendant's repudiation of the theory that it was a heat of passion killing.

 Here, we believe the trial court did not err in instructing the jury and in refusing to give the instruction on manslaughter. Unlike *Leinweber,* which we consider controlling in this case, there is no evidence from which the jury could have found provocation. In *Leinweber,* the victim's curses and vilification would have given a jury a rational basis to find provocation. There is nothing analogous in the present case. A mere finding that the defendant was angry, without some evidence of the victim's acts or words, is insufficient to support a finding of "heat of passion" manslaughter.

(4) Written jury instructions.

 Defendant argues that the trial court's failure to allow the jury to take written instructions into the jury room was reversible error. Rule 26.03, subd. 18(4), Rules of Criminal Procedure, clearly makes this discretionary with the trial court. None of the cases cited by defendant make written instructions mandatory.[12] Although we believe that written instructions are to be encouraged as an aid to juries unversed in the law and that fairness may be better insured by giving written instructions, the trial court has not abused its

---

11. See, also, *State v. Jordan,* 272 Minn. 84, 136 N.W.2d 601 (1965), and *State v. Malzac,* 309 Minn. 300, 244 N.W.2d 258 (1976).

12. *Valley Nat. Bank v. Witter,* 58 Ariz. 491, 121 P.2d 414 (1942); *Kimmons v. State,* 178 So.2d 608 (Fla.1965); *State v. Peters,* 44 Hawaii 1, 352 P.2d 329 (1959).

discretion here. This case does not appear significantly more difficult than other homicide cases in which written instructions are not given. We do believe, however, that trial courts should be liberal in giving the jury written instructions in most criminal cases.[13]

(5) Refusal to allow counsel to comment on the prosecutor's failure to call Diane Swain.

At trial testimony indicated that defendant's father had a criminal record involving violent crimes. Defense counsel apparently wished to raise an inference in the juror's minds that Diane Swain was a likely suspect and that the police failed to fully investigate this possibility. In its case in chief the state called Diane Swain's roommate in an attempt to show that Diane Swain was home on the night of April 18, 1976. The defense attempted to show that Diane Swain could have left unbeknownst to her roommate. Neither side called Diane Swain as a witness. The state requested the trial court to order defense counsel to refrain from commenting on Diane Swain's absence. In reliance on *State v. Yaedke,* 308 Minn. 345, 242 N.W.2d 601 (1976), the trial court so ordered.

Defendant argues that the trial court's order hindered it from raising a reasonable doubt as to his guilt by shifting the blame to his father. The state argues that the defendant was free to comment on Diane Swain as a suspect but that the trial court correctly relied on *State v. Yaedke, supra,* in restricting an adverse comment on the state's failure to call her.

In *State v. Thomas,* 305 Minn. 513, 232 N.W.2d 766 (1975), this court suggested that a trial court had the authority to order defense counsel to refrain from commenting on a prosecutor's failure to call a witness. This rule was stated in the context of deciding whether a prosecutor could comment on his reasons for failing to call a witness. Thomas holds that if a prosecutor is prevented from commenting on his own failure to call witnesses, the defense counsel should likewise be restrained, at least where the witness is equally available to both parties.

In *State v. Yaedke, supra,* this court stated in a footnote that a defense counsel's comment in closing argument on the state's failure to call a named and an unnamed informant as witnesses was "an unwarranted advantage to the defendant." 308 Minn. 347, note 1, 242 N.W.2d 602. There, the named witness had been subpoenaed by the defendant, but he could not be located. The court had sustained the state's objections to disclosure of the unnamed informant. The trial court permitted the defense to point out that the state could have called both witnesses.

■ In the present case, there is no indication that Diane Swain was under the control of the state, although defense counsel implied that he was unable to locate her. The state is not required to negative any possible defense, but must prove its case beyond a reasonable doubt. *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Defendant was not precluded from arguing that Diane Swain was the killer, but only that the state's failure to call her somehow raises a reasonable doubt about defendant's guilt.

The authorities are not clear on the general practice, but McCormick, Evidence, (2 ed.) § 272, suggests that caution should be used in allowing such inferences. Among the factors noted are jury confusion, surprise, and the availability of discovery. See, also, Note, 61 Cal.L.Rev. 1422, which points out that many legitimate reasons may exist for a party's failure to call a witness. In the present case it is clear that the testimony of Diane Swain would have focused on her prior record and her sex change. This would surely have added extraneous issues not clearly relevant to the trial.

■ The defendant points out that his comment on the state's failure to produce a

**13.** In order to avoid undue emphasis on any one instruction, written instructions should, at the request of either party, include all instructions given.

witness would not involve the same constitutional problems as would the prosecutor's similar comment. Cf., *State v. Caron,* 300 Minn. 123, 218 N.W.2d 197 (1974). In the absence of this consideration, it is natural to apply the general rule that no adverse inference may be drawn from a party's failure to produce evidence equally available to both sides. This did not require defendant to produce witnesses on any element but was similar to placing the burden of an affirmative defense, such as an alibi, on defendant. The trial court did not by its ruling in this case place an impermissible burden on the defendant.

(6) Specificity of search warrant.

Pursuant to a search warrant which specified, among other things, "bloodstained items," the police treated numerous surfaces and items in the house with a mixture of benzidine and hydrogen peroxide. Defendant argues that the seizure of items which were not *visibly* bloodstained, but which were first tested with benzidine was illegal. A motion to suppress the items which were not visibly bloodstained was denied prior to trial.

This precise issue appears to be one of first impression in any jurisdiction. Defendant argues that because "bloodstained items" must mean *visibly* bloodstained, the items seized were not described in the search warrant and could only be taken if in plain view. Because the items were not immediately, clearly, and definitely related to a crime, they were not seizable under the plain view doctrine.[14] The state argues that the plain view doctrine does not apply because the items seized were bloodstained.

The analogy drawn by the state is plausible. The state suggests the following: If there is probable cause to search a house for particular items, then that search may be as thorough as necessary.[15] Thus, if a search warrant listed drugs or other para-

phernalia, a search in closets or drawers might be justified. Likewise, a search for bloodstained items permits a search by the use of chemical testing on the theory that attempts to wipe off bloodstains are the equivalent of attempts to hide contraband. In any event, the judge issuing the warrant should be informed of the need for chemical testing. The fact that no visible blood is present may affect the determination of probable cause, especially where the description is as nonspecific as "bloodstained items."[16] See, e. g., Mascolo, *Specificity Requirements for Warrants Under the Fourth Amendment: Defining The Zone of Privacy,* 73 Dickinson L.Rev. 1, 6.

The long used test for specificity of description in search warrants was set forth in *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231, 237 (1927), as follows:

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under the warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

The "plain view" doctrine is an exception to this rule. In *State v. Seefeldt,* 51 N.J. 472, 242 A.2d 322 (1968), the court upheld the seizure of a bloodstained overcoat pursuant to a warrant which authorized seizure of—

"* * * weapon or weapons used in the crime of murder, bloodstained clothes or rags and other instruments or paraphernalia used in [the] crime of murder." 51 N.J. 490, 242 A.2d 331.

The court held that these phrases were sufficiently specific to meet the requirements of *Marron v. United States, supra.* The description in the present case is somewhat less specific but is nonetheless limited. Although the defendant attempted to prove that the benzidine test was unreliable, he

---

**14.** See, *State v. Michaelson,* 298 Minn. 524, 214 N.W.2d 356 (1973).

**15.** The probable cause for the issuance of the warrant was not challenged on appeal.

**16.** The probable cause statement in the search warrant application stated that *laboratory tests* confirmed the presence of blood on the glasses worn by Ms. Swain on April 18.

was not successful. Thus, assuming the test is a reliable indicator of the presence of blood, the discretion of the trained officer is limited by the description "bloodstained items" and a general search cannot be conducted. Defendant does not claim that the test was applied in places where it would not be reasonable to search for blood. The state's analogy may then be applied and, insofar as the search was limited to those places where bloodstains may have been expected, the use of the test was permissible.

(7) Duration of Search.

The search of the Swain residence was conducted over a 3-day period from April 22 to April 24. Defendant argues that the searches conducted on April 23 and April 24 were not authorized by the warrant and thus were illegal. The defendant cites several cases which hold that a consent given to search a home on one day does not by itself authorize an additional search one or more days later.[17] He argues that these cases should be applied to the present case to invalidate the searches on April 23 and 24.

The state argues that the search warrant authorized what was, in effect, one continuous search lasting over 3 days. It attempts to distinguish the consent cases on the ground that the officers did not retain control over the premises as in the present case. It also argues that consent searches are distinguishable precisely because they are an exception to the warrant requirement.

The state contends that cases concerned with the "staleness" of warrants ought to control in the present case. Minn.St. 626.15 provides that a warrant must be executed and returned within 10 days or it is void. In *State v. Van Wert*, 294 Minn. 464, 199 N.W.2d 514 (1972), this court held that a delay of 27 hours between issuance of the warrant and search was not unreasonable because coordinated police activity was necessary for its execution.

Federal courts have upheld the validity of searches after varying delays between issuance and execution of the warrant. *United States v. Lemmons*, 527 F.2d 662 (6 Cir. 1976) (5 days); *United States v. Bedford*, 519 F.2d 650 (3 Cir. 1975) (8 days); *United States v. Nepstead*, 424 F.2d 269 (9 Cir. 1970) (6 days). The general rule appears to be that as long as there is reason for the delay and as long as facts upon which probable cause is based still exist, a delay of up to 10 days may be justified. In the present case, the warrant was executed on the day it was issued, and some bloodstained items were found that day. It appears then that the probable cause did continue, but other than a desire to search more extensively, no reason was given for the continuation of the search. The state argues that this concept of "continuing probable cause" should be applied in the present case in the same way as it is applied in the cases involving delay in execution of a warrant.

The state also cites the case of *United States v. Bowling*, 351 F.2d 236 (6 Cir. 1965), certiorari denied, 383 U.S. 908, 86 S.Ct. 888, 15 L.Ed.2d 663 (1966), for the proposition that the execution of a search warrant is not limited to the day of issuance. In *Bowling* the police made a search for contraband pursuant to a warrant. They noted several serial numbers, checked them out and returned to seize them the next day. Without analysis, the court rejected a claim that the warrant had been returned the evening of issuance and was thus invalid for the seizure the next day. The rationale for this holding is found in the court's citation of *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), for the proposition that search warrants are not to be interpreted in an overly technical manner.

We hesitate to put a strict limit on the time for execution of a warrant because each case may be different. We hold that because the police found blood-

---

17. *People v. Chism*, 32 Mich.App. 610, 189 N.W.2d 435 (1971), affirmed, 390 Mich. 104,

211 N.W.2d 193 (1973); *State v. Koucoules*, 343 A.2d 860 (Maine 1974).

stains on the first and second day in this case 3 days was not an unreasonable time in which to effectively complete the search by means of chemical tests. We hasten to add, however, that this concept of "continuing probable cause" is to be strictly construed against the state, and the present case must be clearly distinguished from consent and other warrantless search cases.

(8) Competency hearing.

Although a pretrial competency hearing was ordered by the court, there is no record of its being held and no finding of competency was made by the trial court. Defendant's trial counsel nowhere on the record requested a final ruling or renewed his motion for a competency determination.

Defendant argues that this court's decision in *State v. Bauer*, 310 Minn. 103, 245 N.W.2d 848 (1976), mandates reversal. In *Bauer*, the defendant's conviction for second degree murder was reversed on the ground that the trial court failed to make a midtrial redetermination of defendant's competency to stand trial and competency to waive counsel. In *Bauer*, the trial court's ruling on the defendant's competency was based on a prior, pretrial adjudication by another judge. After 4 days of trial, a court-appointed public defender moved for an additional competency hearing based upon Bauer's conduct during the trial.

The United States Supreme Court has clearly held that the trial of a person who is incompetent to assist in his defense is a violation of his due process right to a fair trial. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). In *Bauer*, this court stated:

" * * * [T]hroughout the course of criminal proceedings a trial judge must be vigilant in ensuring that the defendant is competent to stand trial and * *, when a sufficient doubt of the defendant's competence arises, he must observe procedures adequate to ensure the defendant's competency." 310 Minn. 114, 245 N.W.2d 854.

The state argues that *Bauer* does not apply to the present case because there was no evidence before the trial court to suggest that the defendant was incompetent. It argues that the order for hearing was only one factor for the trial court to consider in deciding the competency issue.

The state cites two cases in support of its position: *Richardson v. State*, Ind.App., 351 N.E.2d 904 (1976), and *People v. Armstrong*, 43 Ill.App.3d 586, 357 N.E.2d 84 (1976). In *Richardson*, the court held that there was no abuse of discretion in the court's failure to order a competency trial. After the defendant's arrest, his attorney requested a competency hearing. After a commitment to an institution, the defendant was eventually certified as competent to stand trial. After the prosecution had rested, two psychiatrists testified as to the defendant's competency. They disagreed about whether the defendant was competent to stand trial. In the present case there was no initial determination as to the defendant's competency on the record and no evidence before the trial court on which to base such a finding. There was, however, nothing to indicate that the defendant was not competent to stand trial. At oral argument, counsel for the state did disclose, upon questioning, that defendant was examined by a panel of psychiatrists. One found defendant to be competent and one was uncertain. These reports should have been made a part of the record, and the trial judge should have made an explicit finding on the issue.

In *People v. Armstrong, supra*, the court held that in the absence of a defense motion at trial or post trial and in the absence of any evidence of incompetency the trial court did not abuse its discretion in failing to order a competency hearing. Three months prior to trial the defendant had moved for an examination by a behavior clinic, but no exam was held. Unlike the present case, the defendant presented witnesses and testified in his own behalf. The court held that the mere existence of psychiatric disorders was insuffi-

cient to raise doubts as to the defendant's competency. This case is factually similar to *People v. Armstrong*; the trial counsel for defendant did not renew motions for a competency hearing, as was done in *Bauer*,[18] and counsel were necessarily aware of psychiatric tests performed on defendant. Nothing else in the record indicates that defendant was incompetent to assist in his own defense. Thus, we find no error on this issue.

(9) Pretrial publicity.

Defendant's pretrial motion for a change of venue based on pretrial publicity was denied. The evidence introduced by defendant consisted of newspaper reports, radio scripts, and television scripts which described the events surrounding Betty Swain's disappearance, the discovery of her body, defendant's arrest, and his subsequent trial and sentencing. Between the date of Ms. Swain's disappearance and the arrest and charging of defendant, about a 1 week period, details of the case were presented daily in newspapers, wire service reports, radio news spots, and television news reports. Only a few newspaper reports for the period of April 28 through the trial date were presented to the trial court: Three reports of defendant's not guilty plea in June and several newspaper reports of the trial in November were entered in evidence.

Defendant cites only *State v. Thompson*, 266 Minn. 385, 123 N.W.2d 378 (1963), and argues that the trial court should have granted the change of venue to promote the ends of justice. He further argues that the nature of the charge was such as to incite public passion far in excess of the usual murder, but no evidence or authority is cited. The state persuasively argues that

defendant failed to meet the burden of proving either the inherently prejudicial nature of the publicity or the reasonable likelihood of prejudice.[19]

It does not appear that the court abused its discretion in denying the change of venue. The aggravating circumstances present in *State v. Thompson, supra*, were not present in this case. In *Thompson*, this court pointed to the following factors:

"* * * Over a period of several months hardly a day has elapsed when something has not been said or written in a news medium of one kind or another. * * *

* * * * * *

"The vice of the publicity given in this case is not in printing or disseminating factual news but in printing and broadcasting what purports to be the opinions of people who are supposed to know the facts." 266 Minn. 388, 123 N.W.2d 381.

In the present case the publicity lasted approximately 1 week and was almost entirely factual.[20] There was a lapse of approximately 6 months between the bulk of publicity and the trial itself. See, *State v. Ellis*, 271 Minn. 345, 136 N.W.2d 384 (1965) (7 month interval); *State v. Hogan*, 297 Minn. 430, 212 N.W.2d 664 (1973) (3 month interval).

With no additional showing, defendant is in effect asking this court to grant a change of venue on the presumption that factual reporting of a crime over a 1 week period will invariably prejudice jurors in a trial held 6 months later. No such presumption exists. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

The verdict of guilty of murder is affirmed, but the judgment of guilty of mur-

---

**18.** This does not appear to be a waiver claim. Such a claim would be inappropriate because if a defendant was incompetent to stand trial it is likely that he was incompetent to knowingly waive his constitutional rights. Cf., *State v. Bauer*, 310 Minn. 103, 245 N.W.2d 848 (1976).

**19.** This latter standard is incorporated in Rules 24.03, subd. 1(d), and 25.02, subd. 3, Rules of Criminal Procedure.

**20.** The only expression of opinion which we found was buried in two newspaper reports. A police official stated it was likely that Betty Swain was killed in her home and driven to Hopkins.

der in the first degree is reversed and a judgment of guilty of murder in the second degree is ordered. The case is remanded to district court for resentencing.