**UNITED STATES of America**

v.

**Robert Anthony CORRADO.**

**No. 1:92–00006.**

United States District Court,
M.D. Tennessee,
Columbia Division.

Aug. 27, 1992.

Robert C. Anderson, Asst. U.S. Atty., Nashville, Tenn., for plaintiff.

Sumpter Camp, Asst. Federal Public Defender, Nashville, Tenn., for defendant.

## MEMORANDUM

HIGGINS, District Judge.

The Court has before it the defendant's motion to suppress (filed July 17, 1992; Docket Entry No. 15), supplement to motion to suppress (filed August 7, 1992; Docket Entry No. 21) and several memoranda in support and in opposition thereto.[1] For the reasons discussed below, the Court grants the defendant's motion to suppress and the defendant's supplement to the motion to suppress. Therefore, all evidence seized as a result of the delayed execution of the search warrant and as a result of Mr. Corrado's arrest shall be suppressed.

### I. FACTS[2]

Mr. J.A. Irwin owns the white frame house located at 2976 Highway 48 South in

---

1. Memorandum in support of motion to suppress (filed July 17, 1992; Docket Entry No. 16); government's response to motion to suppress (filed August 10, 1992; Docket Entry No. 22); defendant's position regarding applicability of the *Leon* exception to the exclusionary rule (filed August 19, 1992; Docket Entry No. 28); government's response to the supplement to the motion to suppress (filed August 20, 1992; Docket Entry No. 29); and defendants' reply to government's response to supplement to motion to suppress (filed August 25, 1992; Docket Entry No. 30).

2. The factual background of this case is not disputed. The Court summarizes the facts as stated in the memorandum in support of the defendant's motion to suppress and as reflected

Hickman County which was leased to the defendant, under the name of Plank, and at which the events material to this action transpired. On May 20, 1992, Mr. Irwin was approached by Joe Hunt, who wished to rent the house. Mr. Irwin informed Mr. Hunt that the house was already rented, and that the tenant (the defendant) was supposed to be doing work on the house in part payment of the rent. Mr. Irwin entered the house to check on the work.[3] Mr. Hunt followed. They heard a fan in a back room where Mr. Hunt saw marijuana plants growing.

The next day, May 21, 1992, Mr. Hunt reported his observations to Trooper Danny Wayne Williams of the Tennessee Highway Patrol. Trooper Williams independently corroborated the location and description of the house. He also determined that the descriptions of the tenant (under the name of Plank) and the person (under the name of Hanley) who had the electricity hooked up at the house were identical, although that person had used two different names. With this information, Trooper Williams sought a search warrant to search for "marihuana plants" at the house.

The affidavit submitted by Trooper Williams to Hickman County General Sessions Judge Samuel H. Smith in support of his request for a search warrant read as follows:

[A]ffiant has received information from Joe Hunt, an ordinary citizen known to your affiant to be a self-employed college graduate who is married and the father of a child that he saw a large quantity of marihuana plants growing in the above-described residence on May 20, 1992. Investigation reveals that these premises are leased to a David Plank but that the man who requested electrical service gave the name John Hanley. Both the lessor and the clerk at the Dickson Electric Department, however, describe in the same way the man each dealt with. Joe

Hunt is not connected with any law enforcement agency.

Affidavit of Trooper Williams, attached as exhibit B to the memorandum in support of the motion to suppress (filed July 17, 1992; Docket Entry No. 16). Judge Smith found probable cause and issued the search warrant at 1:45 p.m. on Friday, May 22, 1992.

The house was kept under almost constant surveillance by a total of eight Highway Patrol officers over the next several days. Trooper Williams knew the search warrant would be valid for five days from its issuance, see Tenn.Code Ann. § 40-6-107 (1990), after which time it would become void. Therefore, Trooper Williams knew that the search warrant would be valid until early Wednesday afternoon, May 27, 1992.

On Monday, May 25, the officers planned on entering the house on Tuesday morning. They planned on staying in the house until Wednesday morning to see if anyone would come to check on the marijuana plants. Trooper Williams and his partner, Investigator Mash, knocked on the door, and getting no response, entered the house at about 9:30 a.m. Tuesday morning, May 26. They searched every room to secure the house. They heard a fan in a back room as Mr. Hunt had described to Trooper Williams. In the back bedroom they found approximately 355 growing marijuana plants and an elaborate cultivation set-up. The plants were dry, and the officers thought that someone might come to water them soon. Nothing physically prevented the officers from seizing the plants and cultivation tools when they entered the house. They made a conscious decision to wait and hopefully catch someone involved in the cultivation.

Trooper Williams and Investigator Mash stayed in the house until they were relieved by two uniformed officers at approximately 10:30 p.m. Tuesday night, as had been arranged before Trooper Williams and Inves-

by the evidence at the hearing on the motion to suppress held on August 17, 1992.

**3.** Either Mr. Irwin's key to the back door did not work or he could not find his back door key. In either event, Mr. Irwin and Mr. Hunt

entered the house through the front door, where there was a broken pane of glass through which Mr. Irwin could reach the handle on the inside of the door.

tigator Mash had entered the house. At no time while waiting in the house did Trooper Williams and Investigator Mash signal to other officers involved in the investigation to enter the house and start removing the items seized pursuant to the search warrant. They were concerned that if they started loading the seized plants and paraphernalia, their activity might scare away the growers.

Trooper Williams received a telephone call shortly after midnight informing him that the defendant had been captured after entering the house. Another suspect had fled into the woods and escaped. Only after Mr. Corrado was arrested did the officers start to seize, inventory and transport the plants and other items found in the house. The officers also seized the Mazda RX–7 automobile Mr. Corrado had driven to the house, and various papers found in the car including "a receipt from K–Mart for the same items as those found in the 'grow room' of the house (such as watering can, timer and plant food)." Memorandum in support of supplement to motion to suppress at 2 (filed August 7, 1992).

## II. DISCUSSION

### A. *Sufficiency of the Search Warrant*

Mr. Corrado argues that "[t]he search warrant was not supported by probable cause and, therefore, violates the Fourth Amendment." Motion to suppress at 1. A reviewing court should "accord[ ] 'great deference' to a magistrate's determination" that probable cause exists to issue a search warrant. *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677, 693 (1984) (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637, 645 (1969)). "That determination should not be set aside unless arbitrarily exercised." *United States v. Swihart,* 554 F.2d 264, 270 (6th Cir.1977). In this case, the Court finds that Judge Smith had sufficient information before him to determine that probable cause existed to issue the search warrant.

In *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527, 547 (1983), the Supreme Court reaffirmed "the traditional standard for review of an issuing magistrate's probable cause determination ... that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697, 708 (1960)). The Supreme Court also rejected the strict two-prong test adopted from its decisions in *Aguillar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli, supra,* and adopted a "totality-of-the-circumstances approach" as to whether probable cause existed to issue a warrant. *Gates,* 462 U.S. at 230–31, 103 S.Ct. at 2328, 76 L.Ed.2d at 543–44.

According to the Supreme Court, " '[t]hese are not technical [considerations whether probable cause exists]; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Id.* at 231, 103 S.Ct. at 2328, 76 L.Ed.2d at 544 (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1890 (1949)). In addition, affidavits on which warrants are based "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684, 689 (1965).

With this legal background, the Court finds that Trooper Williams' affidavit was sufficient on its face to justify issuance of the search warrant. The affidavit described the house and its location, and contained Trooper Williams' statement that Mr. Hunt had seen marijuana in the house within the preceding twenty-four hours and the descriptions of the tenant and the person who had contacted the electric company. Certainly the affidavit could have been more detailed. However, interpreting it in a "common sense" rather than a "hypertechnical" manner, *Ventresca,* 380 U.S. at 108, 109, 85 S.Ct. at 746, 13 L.Ed.2d

at 689, the Court concludes that Judge Smith had a " 'substantial basis' for ... conclud[ing] that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331, 76 L.Ed.2d at 547 (quoting *Jones*, 362 U.S. at 271, 80 S.Ct. at 736, 4 L.Ed.2d at 708); *see United States v. Pelham*, 801 F.2d 875, 878 (6th Cir.1986) *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1305, 94 L.Ed.2d 160 (1987).

■ The Court further finds that, even if the search warrant is "ultimately found to be unsupported by probable cause," *United States v. Leon*, 468 U.S. 897, 900, 104 S.Ct. 3405, 3409, 82 L.Ed.2d 677, 684 (1984), Trooper Williams' reliance thereon was "objectively reasonable," *id.* at 922, 104 S.Ct. at 3420, 82 L.Ed.2d at 698, and to that extent the evidence seized pursuant to the search warrant should not be excluded from evidence. There is no allegation that Judge Smith abandoned his role as a "neutral and detached" magistrate or that Trooper Williams in any way misled Judge Smith or recklessly disregarded the truth in seeking the search warrant. *Id.* at 914, 923, 104 S.Ct. at 3416, 3421, 82 L.Ed.2d at 693, 698–99. Nor does the Court find, as discussed above, that the affidavit on which the search warrant was based did not provide Judge Smith with a "substantial basis for determining the existence of probable cause." *Id.* at 915, 104 S.Ct. at 3416, 82 L.Ed.2d at 693 (quoting *Gates*, 462 U.S. at 239, 103 S.Ct. at 2332, 76 L.Ed.2d at 549).

## B. *Scope of the Search Warrant*

### (1) Particularity

■ Mr. Corrado further argues that "the officers exceeded the scope of the search warrant and seized items not particularized in the warrant." Motion to suppress at 1. The search warrant, by its terms, commanded Trooper Williams to search the "house and curtilage" described in the search warrant for "marihuana plants." Search warrant, exhibit B to government's response to motion to suppress (filed August 10, 1992; Docket Entry No. 22). The government contends that "the vast majority of items seized in this case

[in addition to the marijuana plants named in the search warrant] fall within the plain view exception to the particularity rule...." Government's response at 16.

The Supreme Court discussed the plain view exception at some length in *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564, 581–87 (1971). In summarizing the different scenarios in which the exception might arise, the Supreme Court stated:

> What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification ... and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

*Id.* at 466, 91 S.Ct. at 2038, 29 L.Ed.2d at 583; *see United States v. Rodriguez*, 596 F.2d 169, 175 (6th Cir.1979). The Court finds that the items seized in the house, other than the golf clubs and bag, fall within the plain view exception. Trooper Williams had been a narcotics officer for thirty-eight months before being transferred to his current assignment with the automobile theft unit of the Tennessee Highway Patrol. At the hearing on the defendant's motion to suppress, Trooper Williams testified as to the incriminating nature of the objects seized.

For the seized items to be admissible under the plain view exception to the warrant requirement, however, the initial intrusion into the house must have been legal. The officers must have been in the house pursuant to a valid search warrant or pursuant to a legitimate exception to the warrant requirement. *See id.* In this case, when the officers first entered the house, they did so pursuant to a valid search warrant. However, as the Court will discuss

below, the officers exceeded the scope of the search warrant by waiting in the house for the specific purpose of arresting anyone who came to take care of the marijuana plants. Therefore, nothing seized after the officers exceeded the scope of the search warrant shall be admissible.

### (2) Waiting Inside the House

■ Although Mr. Corrado does not argue directly that the officers exceeded the scope of the search warrant by remaining in the house throughout the day and night of May 26, he indirectly makes this argument when discussing the *Leon* good faith exception to the warrant requirement. *See* defendant's position regarding the applicability of the *Leon* exception to the exclusionary rule (filed August 19, 1992; Docket Entry No. 28); *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Trooper Williams and Investigator Mash entered the house legally, pursuant to the search warrant, at approximately 9:30 a.m. on Tuesday, May 26, 1992. As previously arranged, they remained in the house until they were relieved by two uniformed officers at approximately 10:30 p.m. that night. The uniformed officers remained in the house until shortly after midnight, when Mr. Corrado was arrested as he entered the house.

Only after Mr. Corrado was arrested did any law enforcement officer begin to seize and inventory the marijuana plants and other incriminating items found in the house. During the more than fourteen hours that officers had been in the house before Mr. Corrado's arrest, nothing was done to seize the plants or other items. All the officers in the house did was wait for someone to come to the house so that they could arrest him. Trooper Williams testified at the suppression hearing that, at

least by Monday, the officers had planned on staying in the house until Wednesday morning to see if someone would come to the house. If no one came to take care of the plants by Wednesday morning, then the officers would begin to seize them. The officers were not physically prevented from seizing the goods earlier. Rather, they were concerned that if they started to load the items into their vehicles, the activity might scare away the growers they were trying to apprehend.[4]

It is a "longstanding requirement[ ] that the officers remain on the premises only so long as is reasonably necessary to conduct the search...." 2 Wayne R. LaFave, Search and Seizure 161 (1978). *See e.g., United States v. American Brewing Co.*, 296 F. 772, 777 (E.D.Pa.1924) (officers executing search warrant "had no right to remain on the defendant's premises longer than was reasonably necessary to make a search and remove such personal property as they were authorized to seize"); *Levin v. Blair*, 17 F.2d 151, 152 (E.D.Pa.1927) ("officers have no right of possession, or to remain on the premises for a longer time than is reasonably necessary to execute the [search warrant]"). Certainly, in this case, the officers could have conducted the search during the hours that they sat waiting for a malefactor to arrive.

The facts in this case are somewhat similar to those in *United States v. Gagnon*, 635 F.2d 766 (10th Cir.1980) *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981). In *Gagnon*, deer hunters discovered a newly constructed metal barn on a farm. The hunters peered through a crack above the barn door and saw what they thought was marijuana. They contacted state narcotics agents, some of whom drove immediately to the remote area after obtaining a search warrant. When the agents opened the barn, they

---

**4.** The government also asserts that Trooper Williams remained in the house in order to watch at least one full cycle on a timer attached to the grow lights. The timer was set to go on at 4:30 p.m. and stay on until 5:00 a.m. The Court agrees with the defendant that "[t]his is clearly, however, an after-the-fact excuse. Whether or not the timer works is not crucial, or even necessary, to the prosecution of cultivat-

ing marijuana as charged in the indictment." Defendant's reply to government's response to supplement to motion to suppress at 2 (filed August 25, 1992; Docket Entry No. 30). As Trooper Williams testified, the officers had planned on staying in the house to make an arrest. That is why they were in the house from 9:30 a.m. until after midnight, not to watch a timer.

found more marijuana than they could transport, and they had to wait until a four-wheel drive vehicle could arrive the following day. While the agents waited for the transport vehicle to arrive, the defendant drove up to the barn. He was arrested after one of the officers viewed marijuana in plain view in his camper. A search of his vehicle revealed other incriminating evidence. *Id.* at 767–68.

Mr. Gagnon contended that the agents had exceeded the scope of the search warrant by remaining on the property after having discovered the contraband described in the warrant. The Tenth Circuit determined that exigent circumstances prevented the agents from fully executing the warrant on the first day. *Id.* at 769. The court found that

> [t]he agents were responsible for securing the marijuana until it could be disposed of and were justified in staying on the premises until it could be removed from the property. The government's intrusion under the circumstances was minimal. The barn was located on uninhabited land; the agents slept in their vehicles and avoided any unreasonable interference with the property.

*Id.* The differences between the facts in *Gagnon* and the facts in this case are fatal to the government's arguments. Here the government could have removed the marijuana from the house immediately after entering the house pursuant to the search warrant. They affirmatively chose not to in order to catch the growers. In addition, the search warrant in *Gagnon* was for an uninhabited barn, not for the defendant's home. And the officers in the instant case stayed in the defendant's home, not in their vehicles to avoid any unreasonable interference with the property.

This case is not like *State v. Swain*, 269 N.W.2d 707 (Minn.1978) cited by the government. *See* government's response to supplement at 3. In *Swain*, the court upheld a three day search pursuant to a search warrant during which time the investigators completed lengthy chemical tests for blood stains. *Swain*, 269 N.W.2d at 718–19. In this case, there was no ongoing investigation similar to that in *Swain.* Here, by contrast, the officers entered the house intending to remain there until they caught a suspect or until the statutory five-day period for executing the search warrant expired.

For these reasons, the Court finds that the officers exceeded the scope of the search warrant by remaining in the house for more time than was reasonably necessary to execute the search warrant. Therefore, the items seized from the house after the officer's authority under the search warrant expired shall be suppressed from being entered into evidence in this matter. Since the officers did not begin to seize and inventory any of the items in the house until after they had arrested Mr. Corrado, and after their authority under the search warrant had expired, all the evidence seized from the house shall be suppressed.

## C. The Arrest

■ Mr. Corrado's final argument for suppressing evidence is premised on the alleged illegality of his arrest. *See* supplement to motion to suppress at 1. In *State v. Chaisson*, 125 N.H. 810, 486 A.2d 297 (1984), police officers entered the defendant's apartment pursuant to a valid search warrant. They found the stolen items they were searching for and terminated the search. While the other officers took the stolen property to the police station, one officer remained in the apartment for the sole purpose of awaiting the defendant's return.

The New Hampshire Supreme Court suppressed the evidence which the police seized after the illegal arrest of the defendant. The Court found that,

> at the time of the defendant's arrest, the police officer was on the premises merely to await the defendant's return and was not conducting or waiting to resume the search pursuant to the search warrant.... Thus, absent consent or exigent circumstances, the police were not lawfully on the premises when the arrest occurred. No distinction exists between an illegal entry and an illegal remaining on the premises, and therefore the State

should have obtained a warrant before arresting the defendant.

*Id.* 486 A.2d at 303–04.[5] The Court reasoned that the officer's "remain[ing] in the defendant's apartment for the purpose of arresting the defendant when he came home.... although physically passive, constituted a search for the defendant within his home. The warrant requirement was therefore applicable." *Id.* at 302 (citations omitted).

Similarly, in *People v. Boehm*, 89 Ill. App.3d 176, 44 Ill.Dec. 826, 411 N.E.2d 1192 (1980), the police entered the residence where the defendant had been staying pursuant to a valid search warrant. The officers executed the search warrant. All the officers left, except for two officers who remained to arrest the defendant. "In a search incident to the arrest, police found items on defendant's person which were determined to be a controlled substance" for which he was convicted. *Id.* at 177, 44 Ill.Dec. at 826, 411 N.E.2d at 1192.

The court saw "no distinction between a nonexigent entry and a nonexigent remaining on the premises," *id.* at 178, 44 Ill.Dec. at 827, 411 N.E.2d at 1193, and suppressed the controlled substance found on the defendant's person during the illegal arrest. The court queried why, "even if [the] defendant were expected to return soon there is no indication as to why police could not have waited in a place where they were allowed to be at, rather that inside the apartment." *Id.*

Following the analysis of these cases, the Court finds that the officers in this case were illegally on the premises when they arrested Mr. Corrado. Their authority under the search warrant had expired, there was no consent, and there were no exigent circumstances to excuse the warrant requirement. It does not matter that in *Chaisson* and *Boehm* the officers first completed their search and then sat in wait, whereas the officers in this case first waited and then completed the search. To distinguish the cases on this basis would be to elevate form over substance. Therefore,

the Court finds that Mr. Corrado's arrest was illegal, and the evidence seized pursuant to the illegal arrest shall be suppressed.

### III. CONCLUSION

While the Court certainly does not condone the drug distribution activities with which Mr. Corrado is charged in this matter, the Court cannot sanction police activity which exceeds the bounds of the Fourth Amendment. Therefore, for the reasons discussed above, the Court shall grant the defendant's motion to suppress and the defendant's supplement to the motion to suppress.

---

5. Although the New Hampshire Supreme Court based its decision on the state constitution, the same rationale applies under the Fourth Amendment to the United States Constitution.