THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHESTER ARMSTRONG, Defendant-Appellant.

First District (1st Division)    No. 62638

Opinion filed October 25, 1976.

588

James Geis and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a bench trial, Chester Armstrong (defendant) was found guilty of burglary (Ill. Rev. Stat. 1973, ch. 38, par. 19—1); rape (par. 11—1); contributing to the sexual delinquency of a child (par. 11—5); aggravated kidnaping in that he knowingly and secretly confined the complaining witness against her will and committed rape (par. 10—2); aggravated kidnaping in that he knowingly and secretly confined the complainant and committed a deviate sexual assault (par. 10—2); deviate sexual assault (par. 11—3) and escape while charged with a felony (par. 31—6(c)). He was sentenced to 6 to 18 years for burglary; 6 to 18 years for rape; 6 to 18 years for each of the two counts of aggravated kidnaping; 6 to 18 years for deviate sexual assault; 1 year for contributing to the delinquency of a minor and 1 year for escape with all sentences to run concurrently. Defendant has appealed.

In this court defendant contends that a bona fide doubt as to his fitness to stand trial existed but that a competency examination ordered by the trial court was never carried out and prior to sentencing defendant informed the court of his previous psychiatric treatment; the inherently improbable testimony of the complaining witness was insufficient to sustain the conviction; the multiple convictions all arose from a single offense; he was denied his right to a meaningful appeal because of loss of notes taken by the official court reporter and the 1-year sentences for misdemeanors should be reduced.

The alleged crime occurred on September 13, 1973. The complaining witness, then 17 years old, lived with her mother, brothers and sisters in an apartment on West Harrison Street, in Chicago. About 4:30 p.m., when the witness was alone in the apartment, defendant knocked on the door and asked if "Bunny" was there. This was the nickname given to the complaining witness. She responded negatively. Defendant also inquired as to whether her mother and father were home and she again responded negatively. The defendant forcibly pushed in the locked door and entered the apartment. He slapped the witness in the face, threatened to kill her and asked her if she wanted to see the gun he had in his pocket. She responded negatively. Defendant demanded that she leave the apartment and walk down the street which she did, with him following behind her. She did not have a chance to turn off the burner under food which was cooking on the stove.

The witness testified further that the two of them walked about a block and a half in this manner and entered a basement apartment on West Congress Street. The trip included passage through two gangways. They passed several people on the way but the witness testified that she made no attempt to escape or call for help. In the living room of the basement

apartment defendant again slapped her, threatened her life and demanded that she undress. He then partially disrobed and demanded that she perform an act of oral copulation. She complied but vomited. Defendant demanded that she lick up the resulting substance on the floor and she pretended to comply but did not.

She further testified that defendant then removed all of his clothing and took her into the bedroom. There he struck and choked her again and again and compelled her to have sexual intercourse with him on the bed. Defendant stated that he had lost his watch and that he was going to look for it. He took a sheet from the dresser, tore it into strips, tied and gagged the witness and left through a rear door. She freed herself from the bonds and gag and went to retrieve her clothes. Defendant returned and told her that "they was after him and for me not to tell them what happened." He told her that he would give her money if she did not tell what he had done. He gave her the clothes and then took her forcibly by her wrist to the front of the house. There he pulled the curtain back and asked her if she knew two people standing outside. She identified them as two men, her boy friend and a neighbor.

Defendant then took the complaining witness to the rear of the apartment. As he opened the rear door she eluded him and ran out of the building where she met the neighbor who took her to the front. At that time she was crying. Her mother appeared and the witness told her that she had been beaten. She spoke to the police officers, out of the presence of her mother, and told them that she had been raped. She testified that she had bruises on her neck and face and a bump over her eye. A vaginal examination made at the hospital later that evening confirmed the presence of sperm. The examiner also found an abrasion and contusion on her neck, a swollen lip and small lacerations. She testified that she had seen the defendant once before about a month and a half prior to the incident but denied that she had ever previously been to the apartment on Congress Street and denied having sexual relations with defendant before the day in question.

Police Officer Petit testified that after receiving a call he had a conversation at the Harrison Street apartment with the mother of the complaining witness at about 6:15 p.m. He accompanied the mother to the Congress Street apartment where they saw the complaining witness leaving the building. In the presence of her mother she stated that she had been beaten and when the mother moved away the witness told him that she had been raped. The witness noted a bruise on her forehead and some scratches on the cheek area. He and another officer found defendant hiding under the bed in a rear bedroom. He did not see evidence of vomit in the apartment.

The complainant's mother testified that she returned home between 5

and 5:30. She found the front door had been broken open. A photograph taken by the police technician showed part of the lock on the wall and a broken part on the floor. The mother found that there was food cooking and burning on the gas stove; the flame was on. She walked to the door where she found and picked up a "gold band watch" with a black face. She then walked outside and had a conversation with the landlord. She called the police who arrived in about 20 minutes.

This witness further testified that she had seen the defendant prior to that date sitting on the step of the building in which she lived. Several hours later he knocked at the door. She asked who was there. Defendant responded that it was the police. She looked out the window and saw the defendant. She asked him who he wanted to see and he replied, "Bunny." She then called the police. She observed her daughter in the county hospital on the night in question, September 13, and saw scratches on her neck and blood at her mouth. On cross-examination the mother added that when she accompanied the police that evening, the complaining witness ran over to her crying when she saw her for the first time.

Police Officer Sykes had also been called to the scene. He investigated the basement apartment and observed a pool of liquid on the living room floor. He also saw strips or pieces of a sheet upon the bed. He identified photographs of this scene taken by the police technician. Later that day he interviewed defendant at the police station. Defendant admitted to him that he had intercourse with the complaining witness with her consent as he had on two previous occasions. He denied that he had kidnapped her. Defendant told him that upon leaving the house with the girl, he saw her family and became frightened and therefore he ran back into the house and hid under the bed.

Regarding the escape, the officer further testified that after he left the defendant he again spoke to the complaining witness. He heard strange noises coming from the room in which defendant had been left. He found that the window and steel grating had been forced open and that defendant was no longer in the room. He saw defendant running away down the street.

Defendant produced witnesses in his own behalf and also testified in his own defense. As will later be fully stated, it was impossible for the report of this portion of the proceedings to be completed in the usual manner because the shorthand notes taken by the court reporter had been lost and were unavailable. These notes contained the defendant's case, rebuttal by the State and closing argument of counsel. The matter was brought to the attention of this court by counsel for defendant. After due consideration this court entered an order directing preparation and filing of a bystander's report of proceedings as provided in Supreme Court Rule 323(c). Ill. Rev. Stat. 1975, ch. 110A, par. 323(c).

Thereafter the trial court conducted a hearing attended by the assistant State's Attorney and the assistant Public Defender who had participated in trial of the cause and also counsel for defendant in this court. The record of these proceedings has been duly prepared, certified by the court reporter and filed in this court as a supplement to the record. It contains a statement by the trial judge that those present attempted to reconstruct the record from the notes taken by the trial attorneys for the People and the defendant, as well as by the trial judge. The parties conferred for this purpose prior to the statements made to the court reporter and reflected in the record before us. Counsel for the defendant in this court stated at that time that this conference had been held and available notes and memories had been compared and discussed and that counsel had "no objection to proceeding at this stage in the manner suggested by the court."

This supplemental record shows that Emily Armstrong, sister of the defendant, testified that, on September 13, 1973, she lived in the first floor apartment at 2845 West Congress Street. There was a basement apartment in that building to which she had no key. She did not pay rent or have access to this basement apartment. She saw the complaining witness eight days before September 13 in the front room of her first floor apartment at about 12 noon. A sister of the witness was also present. The complainant was in her presence for approximately 15 minutes. Prior to her testimony she spoke to the defendant on approximately three occasions at the county jail.

The defendant testified that on September 13, 1973, at approximately 4:30 p.m. he left the home of Patricia Coles. He took a bus at about 4014 South State Street to the intersection of Harrison and State Streets, in Chicago. He then left the bus and walked to a park where he played basketball. He went to a store for a time and then to the apartment of his sister, Emily Armstrong, at 2845 West Congress Street. He arrived there at approximately 5:20 or 5:30 p.m. When he first arrived no one was present but in about 20 minutes he entered his sister's apartment in the company of his niece and nephew. After a time they left and the complaining witness entered the apartment. Defendant let her in and the door was not locked. He knew the complaining witness prior to that day and had seen her on two different occasions. On one of those times he had intercourse with her. On September 13, 1973, he also had intercourse with the complaining witness inside the first floor apartment. Thereafter he walked the complaining witness to her home. He testified that he had no reason to force the complaining witness; he was not in the basement apartment on September 13 and did not rip up any sheets in the apartment. He does not wear a watch and did not have a watch at the time.

The additional record also shows that at trial the parties stipulated that

if Patricia Coles were called she would testify that on September 13, 1973, defendant was at her apartment and left about 4:30 p.m. It was further stipulated that if Henry Jenkins were called he would testify that he was in the basement apartment at 2845 West Congress Street where he tore up some sheets. The defendant then rested his case.

For rebuttal at trial, the parties stipulated that defendant was found guilty of grand theft of an automobile in 1970 for which he received two years on felony probation. Also, in 1973, defendant was found guilty of burglary for which he received two years felony probation with provision for restitution of $300.

At the close of the hearing for preparation of the additional record, counsel for defendant stated that he was obligated to express the fact that the defendant objected to the procedure being followed. Also, defendant had indicated to him that he did not wish to be present for the formulation of the additional report of proceedings and that he would not rely on his memory of what had occurred at the trial. The trial court then stated that all of the parties had checked their notes, that he had checked his own notes and that all certified that the record was true and accurate as well as could be done outside of the actual transcript.

Defendant's first contention concerns his competency to stand trial. (See Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1.) Some three months prior to the commencement of trial, counsel for defendant requested "that the defendant be examined * * *." The court stated, "Motion Defendant, B.C.X." apparently referring to a behavior clinic examination. This examination did not occur. The issue of the fitness of defendant to stand trial was never raised again or mentioned throughout the entire trial. After the finding of guilty and on July 18, 1974, trial counsel for defendant filed a written motion for a new trial. This motion did not raise the issue of the mental fitness of defendant. The hearing on aggravation and mitigation was held on July 22, 1974. The presentence report reflects a statement made by defendant to the effect that he had suffered from a nervous condition since 1971 and had been seeing Dr. Johnson, a psychiatrist, since 1972; his mental condition is poor and he is in need of psychiatric treatment. At the hearing the defendant told the court that he did not receive the psychiatric examination ordered for him; that he had been seen by a psychiatrist in 1972 and in 1973 at the Woodlawn Mental Health Center and once at the Jackson Park Mental Health Center in 1974. He also asked for a stay of mittimus because he had another case pending.

■■ Failure of counsel for defendant to raise an issue in the written motion for new trial generally constitutes a waiver which makes consideration of the contention by this court unnecessary. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) Also, in the case before us after the original request for examination of defendant, no issue

regarding competency was ever raised or mentioned to the trial court until the hearing on sentencing. It has been repeatedly held that "a party who fails to object to claimed error committed during trial waives the right to urge the claim on appeal." *People v. Dukett* (1974), 56 Ill. 2d 432, 442, 308 N.E.2d 590.

However, the issue of competency of a defendant is different from the ordinary claim of trial error. If facts are disclosed to the trial court during the trial by suggestion of counsel or by the court's own observation, it becomes the duty of the trial court sua sponte to make the necessary inquiry into competency of the defendant. (*People v. Burson* (1957), 11 Ill. 2d 360, 370, 143 N.E.2d 239.) In such case the court would be required to order the question of defendant's competency to be determined before proceeding further. Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1(c). See also *People v. Plecko* (1970), 46 Ill. 2d 301, 302, 263 N.E.2d 66.

Examining the entire record, we find no bizarre or unusual conduct by defendant which could reasonably be construed as raising a bona fide doubt of competency. The fact that defendant's conduct, as pictured in the testimony of the complaining witness, would probably be deemed repulsive is not evidence of lack of fitness to stand trial. Simple existence of a sociopathic personality which causes psychiatric and social disturbances would not be sufficient to raise the issue of competency. (*People v. Hammond* (1970), 45 Ill. 2d 269, 277, 259 N.E.2d 44.) At no time did able trial counsel for the defendant raise any issue tending to show failure of defendant to cooperate or his lack of understanding of the nature and object of the charges against him. The fact that the trial court granted a request by defendant's counsel to refer the defendant for an examination at the Behavior Clinic "does not of itself raise *bona fide* doubt as to the competency of the accused requiring a competency hearing * * *." (*People v. Franklin* (1971), 48 Ill. 2d 254, 256-57, 269 N.E.2d 479.) Therefore, the mere statements by defendant concerning previous psychiatric treatment and the statement in the presentence report regarding such treatment for a nervous condition are not sufficient to require a competency hearing.

■■ "Ordinarily it is within the discretion of the trial court to decide whether there exists a doubt as to the competency of the defendant to stand trial." (*People v. Skorusa* (1973), 55 Ill. 2d 577, 582, 304 N.E.2d 630.) It is our considered opinion that no lack of properly exercised discretion in this regard is evidenced by the record before us.

■■ In considering defendant's next argument regarding sufficiency of the evidence to convict beyond reasonable doubt, we must at the outset reject defendant's contention that the testimony of the complaining witness was inherently improbable. Under the circumstances here disclosed, we cannot agree that failure of the complaining witness to

attempt to escape from the defendant while walking to the basement apartment makes the case less convincing. She testified that the defendant initially slapped and threatened her and indicated that he had a gun. At all times he followed closely behind her. She was naturally intimated by this conduct and by the forcible breaking down of the door. It must have seemed obvious to her that resistance or any attempt to escape would have been futile. Resistance and outcry have been held unnecessary where the victim is restrained by fear of violence. (*People v. Montgomery* (1974), 19 Ill. App. 3d 206, 210, 311 N.E.2d 361.) In our opinion the testimony of the complaining witness was positive and credible so that it was sufficient to convict beyond a reasonable doubt even though it was contradicted by the defendant. *People v. Booth* (1974), 20 Ill. App. 3d 88, 92, 312 N.E.2d 736, *leave to appeal denied,* 56 Ill. 2d 588.

■■ The testimony of the complaining witness is strongly corroborated by additional evidence including physical facts. We have here the evidence of the broken door verified by police photographs. The attempt of the defendant to avoid arrest by hiding under a bed and his actual escape from the custody of the police constitute strong presumptive evidence of his guilty knowledge which impelled him to flee. (*People v. Gambino* (1957), 12 Ill. 2d 29, 32, 145 N.E.2d 42.) The evidence of the complaining witness that the defendant struck her is corroborated by the testimony of her mother, a police officer and a doctor at the hospital. All of them testified to the presence of bruises or blood upon her face. The pool of liquid on the floor in the basement apartment, noticed by one of the police officers, is evidence of the mistreatment of the witness as she testified. The testimony of the police officer that he saw torn strips of sheets in the apartment corroborated the evidence that the complaining witness was bound and gagged with strips of sheets. The finding of the watch in the apartment by the mother of the complaining witness, although denied by defendant, is evidence which corroborates the testimony that defendant told the victim that he had lost his watch. The complaint of rape by the victim immediately upon her escape from the defendant is classical evidence of the commission of rape. (*People v. Bush* (1973), 11 Ill. App. 3d 31, 36, 295 N.E.2d 548.) It is true that complainant told her mother only that she had been beaten but she did, almost immediately afterward, complain to the police concerning rape. The unwillingness of a 17-year-old girl to make this complaint to her mother is quite understandable.

Defendant's arguments on the weight of the evidence are centered about the queries as to how the complaining witness knew where to go when the defendant took her to the basement apartment and how did the mother know where the complaining witness was. We regard these issues as being directed to unimportant details. They bear only upon credibility

and do not control the disposition of this appeal. For example, even assuming that the complaining witness knew where the defendant wanted her to go without directions, this fact would indicate only that she knew the location of defendant's apartment. It could not reasonably be construed as evidencing consent to have sexual intercourse or to permit a deviate sexual act. Similarly, the source of the mother's knowledge in directing the police is a detail which neither the State nor the defendant saw fit to develop in the testimony. It would be both futile and unnecessary to engage in theoretical speculation as to the many possible sources of this knowledge, as this factor also has little or no materiality.

Defendant testified that the complaining witness voluntarily engaged in intercourse with him. The parties stipulated that if an alibi witness were called she would testify that defendant was her apartment in the area of South State Street until 4:30 p.m. The complaining witness testified that defendant forced his way into her home at about 4:30 p.m. This conflicting evidence raised an issue of credibility which it was the function of the trial judge to resolve. There was no duty on the part of the trial court to accept the testimony of the defendant and of his alibi witness in preference to that of the complaining witness, particularly in view of the positive corroborative evidence of guilt disclosed by this record. *People v. Jackson* (1973), 54 Ill. 2d 143, 149, 295 N.E.2d 462.

We are fully aware of our "special duty of carefully examining the evidence in rape cases." (*People v. Reese* (1973), 54 Ill. 2d 51, 57, 294 N.E.2d 288.) However, we must be equally aware of the fact that we should not encroach upon the duty of the trial court to weigh the credibility of the witnesses. We may not set aside the finding of guilt here unless the evidence is so "palpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused." (*Reese*, 54 Ill. 2d 51, 57-58.) Our review of this record leaves us with no reasonable doubt of guilt.

Defendant's next contention is directed at the partial report of proceedings filed pursuant to Supreme Court Rule 323(c). (Ill. Rev. Stat. 1975, ch. 110A, par. 323(c).) We have above shown the reason for this procedure and the manner in which it was prepared by trial counsel and by the court. As the supreme court has pointed out, Rule 323(c) is "declaratory of what long has been substantially the practice in this State." (*People v. Kasdictus* (1972), 51 Ill. 2d 72, 74, 280 N.E.2d 704.) A number of cases have held that "responsibility for the proper preservation of the record of the proceedings before the trial court rests upon the defendant." *People v. Smith* (1969), 42 Ill. 2d 479, 483, 248 N.E.2d 68, and cases there cited.

In the case before us, the procedure for use of Rule 323(c) was suggested by this court and the record shows that our suggestion was

carried out in an exemplary manner by the trial judge with the able assistance of trial counsel for both sides. As the supplemental record reflects, this was done with care and was based upon notes made at the time of trial. The result appears to be a fair statement as to what the missing portions of the record would show.

Defendant cites and relies primarily upon *People v. Seals* (1973), 14 Ill. App. 3d 413, 302 N.E.2d 701. *Seals* presents a situation far removed from the case before us. We are in complete accord with the opinion in *Seals* and with the result reached. There, no court reporter was present at the entire bench trial. Although the State's Attorney was directed to proceed under Rule 323(c), this was not done. The trial judge attempted to remedy the situation by filing his own synopsis of the proceedings. The defendant filed a statement which conflicted with that of the judge. This court reversed the conviction and remanded for a new trial. As above indicated, none of these elements is present in the case before us.

■■ In essence, the inquiry which should be made here in whether defendant was actually prejudiced by the use of the procedure under Rule 323(c). In *Seals,* this court pointed out that the record showed "a colorable need" for a transcript so that the defendant could have effective appellate review of his assignments of error. (14 Ill. App. 3d 413, 414.) *Mayer v. City of Chicago* (1971), 404 U.S. 189, 30 L. Ed. 2d 372, 92 S. Ct. 410, cited in *Seals,* held that in such case the burden rested upon the State to show that the alternative to a complete transcript would suffice for an effective appeal. In the case before us a portion of the evidence is missing. The missing portions here, in our opinion, have been adequately replaced in accordance with the requirements of Rule 323(c) by statements of counsel based upon notes taken at trial.

Defendant suggests only that the supplemental material did not include possible ruling on objections regarding improper evidence or remarks of the trial court indicating prejudice. This is pure speculation upon defendant's part as it would seem to us most probable that any such serious errors would have been brought to the attention of the trial court by virtue of the notes taken by trial counsel. The written motion for new trial filed by defendant shows no such contention of error. In this regard we reject defendant's contention that the action under Rule 323(c) was not timely taken in accordance with the rule. This delay was harmless, was joined in by all parties and can as readily be ascribed to defendant as to any other factor. We find no prejudicial error in the use of Rule 323(c) in the situation before us.

■■ ■ Finally, defendant challenges his multiple convictions and sentences. The convictions and sentences for both rape and deviate sexual assault are proper. These offenses both involve clearly divisible conduct. (See *People v. Moore* (1972), 51 Ill. 2d 79, 87-88, 281 N.E.2d 294; *People v.*

*Scott* (1974), 57 Ill. 2d 353, 359, 360, 312 N.E.2d 596, involving attempt deviate sexual assault and *People v. Hunt* (1976), 38 Ill. App. 3d 366, 368, 347 N.E.2d 884, which cites both of these authorities.) However, the conviction for rape and the Class A misdemeanor of contributing to the delinquency of a child both arise from the same act. Therefore, the conviction and sentence imposed for the lesser offense will be reversed. This is virtually the same situation as reflected in *People v. Lilly* (1974), 56 Ill. 2d 493, 495, 309 N.E.2d 1.

■■ The conviction of defendant for burglary is based upon an indictment which charged that the defendant committed burglary with intent to commit the crime of aggravated kidnaping. The charges concerning aggravated kidnaping are based upon secret confinement of the complaining witness and commission of the felony of rape and also upon allegations of secret confinement and the felony of deviate sexual assault. In our opinion, we have here a duplication of convictions and sentences which should not be permitted. The burglary conviction, based upon breaking and entering with intent to commit aggravated kidnaping, arose from the same conduct as involved in commission of the crime of aggravated kidnaping. Therefore, the conviction and sentence for burglary are reversed. (See *People v. Williams* (1975), 60 Ill. 2d 1, 14, 322 N.E.2d 819.) In this regard, the situation differs from that presented in *People v. Johnson* (1970), 44 Ill. 2d 463, 256 N.E.2d 343, where convictions for rape and burglary were upheld. There, the burglary was made with intent to commit robbery and the ensuing rape was a separate and distinct crime requiring entirely different proof. The convictions on two counts of aggravated kidnaping and for escape remain for our consideration.

■■ In our view, only one conviction for aggravated kidnaping is justified on the record before us. We find no reported Illinois decision considering whether multiple felonies committed during a single kidnaping can support multiple convictions for aggravated kidnaping. However, *People v. Goodwin* (1974), 19 Ill. App. 3d 83, 311 N.E.2d 199, provides a persuasive analogy. In *Goodwin,* defendant had been convicted of two counts of aggravated battery, the first for causing great bodily harm while committing a battery and the second for using a deadly weapon while committing a battery. The appellate court held that the two convictions arose from the same conduct because the attack had been continuous and its character had remained unchanged. The conviction for the less serious offense was reversed. In *Goodwin,* the conduct raising the battery to aggravated battery occurred concurrently with the same basic attack. Similarly, in the instant case, the rape and deviate sexual assault were acts which aggravated the kidnaping and coincided with and arose from the same knowing and secret confinement.

Accordingly, reasoning from *Goodwin,* the conviction for the less serious offense must be reversed. We must next determine which of the two counts of aggravated kidnaping involved the more serious offense.

■■ Rape and deviate sexual assault are both Class 1 felonies. (Ill. Rev. Stat. 1973, ch. 38, pars. 11—1(c), 11—3(b).) However, the Unified Code of Corrections provides:

"(d) When a defendant is convicted of a felony or misdemeanor, the court may sentence such defendant to:

"(1) a period of probation or conditional discharge except in cases of murder, rape, armed robbery, violation of Sections 401(a), 402(a), 405(a) or 407 of the Illinois Controlled Substances Act * * *." (Ill. Rev. Stat. 1973, ch. 38, par. 1005—5—3(d)(1).)

This provision reflects the legislative determination that the penalty for rape be more severe than that for deviate sexual assault. (See *People v. Sims* (1974), 20 Ill. App. 3d 1068, 1071, 313 N.E.2d 663.) We therefore reverse the conviction and sentence upon the aggravated kidnaping count which was based on the deviate sexual assault.

■■ The final contention raised by defendant is concerned with the sentence of one-year imprisonment for the Class A misdemeanor of escape. It is correct that the sentence should be modified by reducing it to 364 days which is one day less than one year and which, therefore, complies with the Unified Code of Corrections. (*People v. Johnson* (1973), 15 Ill. App. 3d 741, 746, 305 N.E.2d 208, *leave to appeal denied,* 55 Ill. 2d 606.) But, as the State points out, since defendant has served the sentence for this crime in full, the propriety of the sentence, as distinguished from the conviction itself, is moot. See *People v. Smith* (1974), 59 Ill. 2d 236, 237, 319 N.E.2d 760, concerning the sentence. See *Sibron v. New York* (1968), 392 U.S. 40, 57-58, 20 L. Ed. 2d 917, 88 S. Ct. 1889, regarding the conviction.

To summarize these results, the convictions and sentences for rape, deviate sexual assault, aggravated kidnaping based upon rape and escape are each and all affirmed. The convictions and sentences for burglary, for aggravated kidnaping based upon deviate sexual assault and for contributing to the delinquency of a child and each of them are all reversed.

Affirmed in part; reversed in part.

SIMON and O'CONNOR, JJ., concur.