THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAVID W. SZERLETICH, Defendant-Appellant.

Fourth District   No. 15494

Opinion filed August 6, 1980.

Richard J. Wilson and Diana N. Cherry, both of State Appellate Defender's Office, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (Marc D. Towler and Robert J. Biderman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

The defendant, after a jury trial, was convicted of murdering a one-year-old infant. On appeal, defendant contends: (1) He was not proven guilty of murder beyond a reasonable doubt; (2) he was denied a fair trial by the introduction of a photograph of the victim; (3) he was denied a fair trial by the State's closing argument; (4) he was in custody when he made his pre-arrest admission to the police, and therefore the trial court erred when it denied the defendant's motion to suppress the evidence.

At trial, the medical evidence showed that the death of the one-year-old infant resulted from a blunt trauma to the right side of her head. The two testifying physicians concluded that the cause of the fatal injury was the impact of the infant's head against a relatively immovable object. The side of the skull where impact occurred sustained some large fractures, indicating that the head had been in motion at the time of the impact. The child also exhibited some swelling and dark coloration in areas of loose skin—the eyelids, upper portions of the neck, and behind the ears.

Defendant and Crystal Lynch, the child's mother, and the child were living together when the latter died. On the night the child sustained her fatal injuries, July 19, 1978, the defendant, after coming home from work, was asked by Lynch to baby-sit the child because the girl who usually watched the child was unavailable. The defendant agreed.

At trial, the defendant testified that he went into their apartment, after Lynch left for work, and played some records. While the child was in her crib napping, the defendant went next door to talk with the neighbor for a few minutes, then returned leaving the front door unlocked. After the child awoke, he changed her diaper and put her on the floor to play with her toys. In the meantime the defendant watched TV, listened to music, and drank eight to ten beers. Around 9:30 p.m., after changing the baby's diaper, the defendant put her to sleep. He then fell asleep himself until the injured baby was discovered by Lynch around 11:30 p.m.

Testimony at trial further showed that the defendant and Lynch rode with the baby in an ambulance to the hospital, and they followed in a taxi

when the child was transferred to another hospital for emergency pediatric care. The police were summoned. Two detectives reported to the hospital and interviewed first, Dr. Pearson, the Lynch, and lastly, the defendant. The defendant, during interrogation by the police detectives, said that he had hit the child. The defendant was then read his rights, and then one of the detectives wrote out a statement, which the defendant signed at 6:17 a.m. on July 20, 1978.

In substance, the statement was the same as the defendant's trial testimony with the crucial exception that the defendant said he had gotten mad because the baby had been fussing and crying in the crib. As a result, he hit her once, and, then, when she continued crying, hit her three times. The written statement also stated that the defendant loved the child and her mother and that he needed help. When he left the child he thought she was all right.

The defendant testified that the reason he signed the statement was he did not want the child taken away from the mother. He knew that the police were either going to take him or the mother. Defendant also testified that at the time he signed the statement he did not know that the child was seriously injured.

The defendant's pretrial motion to suppress the evidence of his oral and written admissions was denied. As indicated, the State introduced evidence of both admissions at the trial.

The defendant argues that the State did not prove beyond a reasonable doubt that the defendant had the requisite mental state for murder, or alternatively, the defendant's conviction should be reduced to involuntary manslaughter—the reckless commission of homicide without the felonious mental state.

The State contends that the defendant's admission to police that he struck a child with his fist because he had become mad at the child for crying was sufficient proof of the requisite mental state required for murder. We agree.

■■ The defendant was charged with murder as defined in section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(2)), and with felony murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(3)). The felony murder doctrine is operative in Illinois even though the underlying felony—in this case aggravated battery—is not independent of the homicide. See *People v. Viser* (1975), 62 Ill. 2d 568, 343 N.E.2d 903.

The relevant mental state for aggravated battery is that the person committing a battery intentionally or knowingly commits great bodily harm. (See Ill. Rev. Stat. 1977, ch. 38, pars. 12—3, 12—4.) The relevant mental state for murder as defined in section 9—1(a)(2) is that in performing the acts that cause death the defendant knows that such acts

create a strong probability of death or great bodily harm. Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(2).

Thus, the State had to prove beyond a reasonable doubt that when the defendant struck the child he knew such acts created a strong probability of death or great bodily harm; or, when he struck the child he intended the blows to cause great bodily harm.

■■ It is a well accepted principle that intent can be implied or inferred from the character of the act. (*People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468.) Therefore, it is not necessary to directly prove that the defendant had the intent to murder (or for that matter, the intent to commit aggravated battery). All that need be proved is that he voluntarily and wilfully committed an act, the natural tendency of which was to destroy another's life or inflict great bodily harm. Again, the requisite mental state may be inferred. *Davis; People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455; *People v. Kinzell* (1969), 106 Ill. App. 2d 349, 245 N.E.2d 319.

■ From the evidence presented it was reasonable to infer that the defendant hit the child's head hard enough to propel it into an immovable object, thereby causing the child's death. The force with which the defendant hit the child's head leaves little doubt that such an act had a natural tendency to inflict great bodily harm. Therefore, it was proper for the jury to infer the required mental state from the act. Accordingly, we hold that the State proved the defendant guilty of murder beyond a reasonable doubt.

The defendant contends that he was denied a fair trial because the trial court allowed the introduction of a photograph of the victim. Essentially, the defendant argues that the photograph's probative value was slight, while its inflammatory impact was great, therefore its admission into evidence was an abuse of discretion.

The admission of a photograph of a murder victim is a matter reserved to the sound discretion of the trial judge. (*People v. Myers* (1966), 35 Ill. 2d 311, 331, 220 N.E.2d 297, 309, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752; *People v. Jones* (1978), 62 Ill. App. 3d 443, 379 N.E.2d 301.) The Illinois Supreme Court has held that a photograph may be relevant to assist the jury in understanding medical testimony concerning the cause of death (*People v. Owens* (1976), 65 Ill. 2d 83, 93, 57 N.E.2d 465, 469), that photographs do not become cumulative because there was oral testimony concerning the same issue, and that a photograph is admissible, even though it has a gruesome nature, where it is relevant and establishes some fact in issue. *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27; see *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.

■■ In this case there was contradictory medical testimony as to the cause

of death—whether the injuries resulted from a fall or a blow to the head. The only photograph admitted supported one of the theories of the cause of the child's death, although the photograph did show some medical equipment attached to the child that was being used to treat her injuries. Because the photograph was admitted for the purpose of aiding one of the doctors' testimony the trial court did not abuse its discretion in admitting the photograph. See *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.

The defendant contends that he was also denied a fair trial by the prosecutor's closing argument. At trial, the following exchange took place:

"[T]he people who came in here who said he's a peaceful and law-abiding citizen, I don't have any quarrel what they say may very well be true * * * but I want you to consider one thing, every time in this country that there is a vicious and senseless crime, the kind of crime that draws a lot of media attention, what did the members of the press do? Well, one of the things they do is go out to where the person who is charged lived and they talk to his neighbors and what do his neighbors say? They say I can't believe that he would do this, he was such a wonderful man, he was just a peaceful and law-abiding citizen, he used to dress up like a clown and entertain children, he was a member of the Junior Chamber of Commerce—

MR. BEEMAN: I object, if there's trying to be a connection drawn between this Defendant and some outrageous crime that doesn't have anything to do with this.

THE COURT: All right, you can argue the evidence and reasonable inferences to be drawn from the evidence. Proceed within those guidelines.

MR. SHIFFMAN: He was a member of the Junior Chamber of Commerce, he was on the Board of Supervisors in his town, he was a former policeman, I just can't believe that my next door neighbor would commit this kind of crime.

Ladies and gentlemen, people have lapses of character, people who are the noblest and the most competent people have lapses of character.

* * *

So what that means is, what I'm trying to get across to you is very simple, that everybody has lapses of character * * *."

The State in its closing argument also referred to the Rideout case and to General MacArthur and made other arguments objected to only in the defendant's brief. We are unable to say that these references were so prejudicial as to deny the defendant a fair trial. Therefore, these objections have been waived. (*People v. Smothers* (1973), 55 Ill. 2d 172,

302 N.E.2d 324; *People v. Moore* (1956), 9 Ill. 2d 224, 137 N.E.2d 246.) Only the State's reference to the Gacy case was objected to and raised in the defendant's motion for a new trial. Accordingly, it is the only portion of the closing argument that we will review.

■■ Ostensibly, the State was not attempting to draw a comparison between the defendant and John Wayne Gacy. (Compare *People v. Lion* (1957), 10 Ill. 2d 208, 139 N.E.2d 757; *People v. Veal* (1978), 58 Ill. App. 3d 938, 374 N.E.2d 963.) The objected-to portion of the closing argument taken in its context of commenting upon the defendant's reputation witnesses is not calculated to inflame the passion of the jury. The complained-of portion of the State's closing argument, although unfortunate, did not rise to the level of reversible error.

■■ The defendant's final argument is that his admission to the interrogating police officers that he struck the child four times was made while he was "in custody" prior to having been given any *Miranda* warnings. *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, mandates that if the defendant is in "custody or otherwise deprived of his freedom of action in any significant way" he must receive the *Miranda* warnings; if not, any resulting statement may not be admitted into evidence to prove the defendant's guilt. Thus the defendant contends that his oral admission was inadmissible under *Miranda*, and consequently the written statement that he signed should be inadmissible evidence under the fruit-of-the-poisonous-tree doctrine.

The trial court denied the defendant's pretrial motion to suppress the oral and written admissions. Although the trial court found that the defendant's admissions were a result of police interrogation, it found that the defendant was not "in custody" when he first admitted to striking the child four times.

At the suppression hearing while the defense counsel was cross-examining one of the interrogating police officers the following exchange occurred:

> "Q. And at that point—at that point that David Szerletich came in the lounge and you started to question him would you have let him go?
>
> MR. SHIFFMAN [prosecutor]: I object, that's not relevant, Judge, whether he should have let him go or not.* * *
>
> THE COURT: Well, I'm not going to sustain the objection. * * * I don't think that the officer's state of mind is relevant. I think the circumstances surrounding the taking of the statement are relevant."

The defendant, in addition to arguing that the evidence presented showed that a custodial interrogation occurred, argues that the trial court erred by refusing to allow evidence of the police officer's state of mind.

Therefore, the defendant thinks that the case should be remanded for a new suppression hearing.

In *People v. Gan* (1979), 75 Ill. App. 3d 72, 76, 394 N.E.2d 611, 614, this court stated:

> "A number of factors have been considered by the courts of this State in determining whether a person's freedom of action had been sufficiently restrained. Some courts have looked at the subjective knowledge of the police officer or the tone or mode of questioning. [Citation.] Others have looked to see whether the defendant reasonably believed he was free to leave. [Citation.]
>
> Under either approach, the defendant in this case was 'in custody.' We note, without particular emphasis: The arresting officer stated that he knew that a burglary had been committed and in his mind the defendant was a suspect; he also stated that the defendant was not free to leave and that he was going to place the defendant under arrest after asking him about the merchandise; the questions asked in this case were specifically addressed at ascertaining what relationship, if any, the defendant had to the crime being considered. Under these circumstances, the *Miranda* warning should have been given prior to the questioning."

Over a decade before *Gan*, in *People v. Bryant* (1967), 87 Ill. App. 238, 231 N.E.2d 4, this court found that even though the defendant voluntarily came to the police station, the questioning of him was custodial. Crucial to this determination was the fact that the police officer testified that the defendant would not have been able to leave the station.

The Illinois Supreme Court in *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870, found that the defendant was not in custody and therefore no *Miranda* warnings were needed. The court justified its finding by stating:

> "[T]he record supports the interpretation that defendant was not compelled to come to the station, much less to answer questions, and that, regardless of defendant's subjective beliefs, he was not, and would not have been, forbidden to leave. The officers testified that he would have been permitted to leave because 'there was nothing to hold him for.' [Citation.] In short, when the situation is viewed objectively, defendant was not in custody * * *, and so *Miranda* warnings were not required at the outset of the interrogation." 68 Ill. 2d 158, 170, 368 N.E.2d 870, 874-75.

Some appellate districts have read *Wipfler* as enunciating a test for deciding whether a defendant is in custody. These districts cite *Wipfler* for the proposition that the question of whether a custodial setting exists must be determined by an objective evaluation of the circumstances surrounding the questioning. *People v. Hentz* (1979), 75 Ill. App. 3d 526,

1128

394 N.E.2d 650; *People v. Kennedy* (1978), 66 Ill. App. 3d 267, 383 N.E.2d 713. We agree.

What evidence is relevant to an "objective evaluation of the circumstances surrounding the questioning" has not been prescribed. However, it is clear that the Illinois Supreme Court considers the testimony of police officers on whether they would let the defendant leave the questioning as evidence relevant to the determination of whether the defendant was in custody, although it also seems clear that no one circumstance is determinative. Therefore, we conclude that the trial court erred when it excluded evidence of the question of whether the police officer would have let the defendant leave the interrogation.

In its order denying the defendant's motion to suppress evidence, the trial court stated:

> "The evidence indicated that the questioning took place at a conference room at the hospital, that the police officers were present at the hospital after it was reported, that the Defendant was asked to go to the conference room to talk to the police officers concerning this occurrence after the police officers had first talked with the girlfriend, who was the mother of the child involved, and that the Defendant was then asked to go to a conference room to talk to police officers, and he did that. He went to the conference room at the hospital, sat down in the room—at a table in the room with the police officers and discussed the matter. There is a—certainly no evidence that the Defendant was restrained in any way or that it was the type of situation that would lead either the Defendant or any reasonable person to believe that it was a custodial situation—anything other than a noncustodial interrogation at the hospital following the report of the occurrence. The evidence is to the contrary, that the Defendant was never coerced or forced to go into the conference room and discuss the situation with the police officers. He was never told he was under arrest or in custody or that he couldn't leave. There was never any restraint placed on the movement of the Defendant, and that it seems to me, the Court is of the opinion, and finds that it was a non—under the circumstances a non-custodial interrogation."

Briefly, some of the other evidence presented at the suppression hearing was that no one, other than the two interrogating officers and the defendant, was present during the questioning and the two detectives knew before they started the interrogation that the defendant was responsible for watching the child that evening. The detectives testified that the defendant appeared nervous and was shaking throughout the interrogation. Moreover, the two interrogating officers each weighed approximately 80 pounds more than the defendant. They questioned defendant for at least 20 minutes before he admitted striking the child. As

previously noted, the defendant signed a statement written by the police officer stating the same at 6:17 in the morning. Although the defendant was not handcuffed or under arrest, he was never told he was free to go, and the defendant testified that he did not think that he was free to leave the interrogation.

Additionally, it was brought out at the suppression hearing via uncontradicted psychiatric testimony that the defendant had an IQ of 81, and that he was a withdrawn, socially inept individual who was by nature extremely anxious. The psychiatrist also testified that the defendant was very easily intimidated and that "[h]e is unsophisticated and not well educated. His repertoire of responses, his ability to adapt to new and anxiety producing situations is quite limited."

It was the psychiatrist's opinion that the maintenance of the familial unit of Crystal, Brandy, and himself was of utmost importance to David, and that he wanted to protect Crystal. Therefore, the doctor concluded that the defendant would have signed almost anything to protect Crystal Lynch. Both Crystal Lynch and the defendant testified at the pretrial hearing that the defendant had decided to take the blame for the child's injury if any problems appeared to be developing.

After an evaluation of the evidence, we cannot say that the trial court's finding that the interrogation was noncustodial is against the manifest weight of the evidence it considered. However, the trial court erred in not allowing evidence of the police officer's subjective state of mind. Because constitutional rights as enunciated in *Miranda* are in issue, for this error to be harmless, it would have to be harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) In the factual context of this case, this error is not harmless.

Accordingly, we vacate the defendant's conviction and remand the cause for a new determination of whether the defendant's admission was made in custody. If upon consideration of the evidence presented in the new suppression hearing, in light of the views expressed in this opinion, the trial court finds that the defendant's first admission was made in a noncustodial situation, it will enter a new judgment reinstating the conviction. If it finds that the first admission was made while the defendant was in custody, it will grant the defendant a new trial. See *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.

For the foregoing reasons, the judgment of the trial court is vacated and this cause is remanded for proceedings consistent with the directions herein.

Vacated and remanded with directions.

MILLS, P. J., and GREEN, J., concur.