THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EZRA UPSHAW, Defendant-Appellant.

First District (2nd Division) No. 80-1782

Opinion filed December 29, 1981.

James J. Doherty, Public Defender, of Chicago (James L. Rubens, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Ruth Stern Geis, and Mark R. Fuller, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant was charged with, and, after a jury trial, convicted of three murders. He was sentenced to 300 to 900 years imprisonment. For appellate review he raises the issues of whether: (1) the trial court properly admitted evidence of defendant's attempted escapes subsequent to his arrest; (2) the jury should have been instructed as to the consequences of a verdict of not guilty by reason of insanity; (3) the prosecutor's closing argument was improper and deprived defendant of a fair trial; and (4) defendant was proved sane beyond a reasonable doubt. We affirm.

Defendant was charged on September 25, 1974, with the murders of Henry Stewart, Mary Wilson, and Christ Wilson. He was found unfit to stand trial from March 10, 1975, until April 23, 1980, when, after a hearing, he was adjudged competent to stand trial.

At trial, Chicago Police Officer Thomas McKenna testified that three days after the victims' bodies were discovered, police found defendant in an apartment hiding in a crouched position behind a refrigerator. He was calm, stated that he understood his rights, and asked to which police station the officers were taking him. A woman, Karen Mundane, was in the apartment, and a gun was found in her purse. Defendant claimed ownership of the gun, stating that he had put the gun in the purse when the police arrived thinking the gun would not be found there.

At the police station, defendant again stated that he understood his rights and gave a narrative oral statement to Officer McKenna. Several hours later, he gave substantially the same statement in question and

answer form to felony review assistant State's Attorney James Klein and a court reporter. During the interview with Klein, defendant understood. the questions, gave responsive answers, appeared logical and rational, and talked in a normal, animated voice. In a signed confession, defendant related that in the early evening on August 23, 1974, he saw Henry Stewart, Mary Wilson, and her three-year-old daughter Christ, on the street. Earlier in the day, defendant had pawned, for $25, a .32-caliber gun to Stewart. Defendant now wanted to pay Stewart the $25 in return for his gun. Stewart said he did not have the gun. Defendant went to his mother's house nearby and got another .32-caliber gun which he kept there. He then went outside and caught up with Stewart, Wilson and her daughter. He offered to let them stay at his house since their apartment had been raided and they felt they couldn't return to it. They all went to defendant's house and the three adults "shot some stuff."

Sometime after they had taken the drugs, the confession continued, Mary Wilson dropped her purse and defendant's gun fell to the floor. Stewart and defendant argued about the gun; thereafter, Stewart reached for it. Defendant shot him with the other gun. Mary Wilson attacked defendant and was also shot by him. Christ Wilson, Mary's three-year-old daughter, began screaming so defendant put his hand over her mouth and nose, and afterwards realized she was dead. Defendant then dismembered the bodies of Henry Stewart and Mary Wilson, severing their heads, legs and arms, in order to move them from the apartment. He put the various body parts in garbage bags and disposed of the bodies in different locations near his apartment. Defendant's girlfriend helped him dispose of Stewart. They then cleaned up the blood in the apartment, dumped the knives in the garbage and flattened the murder weapon with a hammer.

For the defense, Dr. Werner Tuteur, a psychiatrist, testified that he examined defendant on four separate occasions: the first examination was on September 28, 1974; the second was on April 21, 1979; the third on June 13, 1979; and the fourth on April 19, 1980. In Dr. Tuteur's opinion, defendant was mentally ill and suffering from schizophrenia on the date of the killings, from which he still suffered on the date of the April 19 examination. Defendant was not faking or malingering. In his further opinion, defendant did not comprehend the criminality of his actions and was in no condition to appreciate anything he might do wrong at the time of the offense. Dr. Tuteur based his opinions, in part, on statements made by defendant to him during the examinations, for example: he enjoyed seeing blood spurt; and that he would kill again. He had no remorse and Dr. Tuteur considered that very psychotic. Dr. Tuteur saw the police report of the murders prior to examining defendant for the first time. Although he formed his opinion of defendant's sanity and mental state on September 28, 1974, four weeks after the offense, he did not put it in writing until five years later when he was directed to do so by the court.

On cross-examination, Dr. Tuteur had no knowledge of whether or not defendant had an opportunity to consult his attorney before he discussed the case with him on September 28, 1974. He had not submitted defendant to psychological testing and relied totally on his interview of defendant for his diagnosis. He had not interviewed defendant's mother or family, teacher or the state's attorney in charge of the case. In his report of September 28, 1979, he stated that the possibility of malingering was considered and that defendant had behaved clownishly. The fact that defendant had perfect recall of the incidents leading up to the deaths did not affect his diagnosis because schizophrenics have good memories. The fact that an offender acts with motive does not indicate that he has a sound mind. The fact that an offender cleans up blood after the commission of a crime does not indicate that the person could conform his conduct to the precepts of the law. The planning of a crime doesn't demonstrate that a person understands the consequences and criminality thereof.

On rebuttal for the State, Dr. Jewett Goldsmith, a psychiatrist, testified that he evaluated defendant on October 17, 1977, at the Illinois State Psychiatric Institute (ISPI). This evaluation included a psychiatric interview, a physical examination, and 24-hour observation; it did not include psychological testing. Dr. Goldsmith diagnosed defendant as having an antisocial personality, not a major mental disease. Defendant acted rationally while with other ISPI staff members but was very disturbed during the psychiatric interview. He appeared to be consciously controlling his psychosis; his acts were no better than that of a grade "B" movie actor.

On cross-examination Dr. Goldsmith testified that he had previously examined defendant in 1975 and found him to be schizophrenic. At that time, defendant constituted a danger to himself and others and was not malingering or faking his schizophrenia. Defendant was then committed on the basis of examinations by other psychiatrists. According to Dr. Goldsmith, it is conceivable that a schizophrenic could plan acts despite not appreciating the criminality of those acts. He had given no opinion in 1975 as to defendants' mental state as of August 23, 1974, the date of the offense, and had no way of knowing what it was at that time.

Dr. Richard Rogers, a clinical psychologist at the Isaac Ray Center, examined defendant for 2 hours on September 27, 1979 and for 2 hours and 45 minutes on October 16, 1979. He tested defendant with the Schedule of Affective Disorders and Schizophrenia, which he claimed is very reliable. He diagnosed defendant as having an antisocial personality disorder and schizotypical co-features on August 23, 1974. This was defined as a persistent and recurrent pattern of antisocial behavior in which the rights of others are violated. He further characterized it as a nonpsychotic disturbance which causes difficulty with perceptions, with

communication and with forming long-lasting responsible relationships. In his opinion, defendant was not suffering from a psychosis or any major psychiatric disorder on August 23, 1974, and he was able to appreciate the criminality of his behavior and conform his behavior to the requirements of the law on that day.

Dr. Jonathan Kelly, a psychiatrist at the Isaac Ray Center, examined defendant for a total of 2 hours on August 6, 1979 and November 15, 1979. He reviewed police reports, investigations regarding defendants' friends, preliminary hearing reports, Dr. Rogers' testing results, and defendant's signed confession. In his opinion, defendant did not suffer from a mental disease or defect on August 23, 1974, nor did he lack the substantial capacity both to appreciate the criminality of his conduct and to conform his behavior to the requirements of the law. In Dr. Kelly's opinion, defendant was not suffering from acute schizophrenia at the time of the offense.

At trial, the State also introduced testimony of four correctional officers and one police officer concerning successful escapes by defendant from custody and attempts within a 51-month period after his arrest. Sergeant James Harris, a policeman for the State of Illinois Mental Health Police Department, testified that on April 10, 1975, defendant escaped from custody during a court proceeding held at the Illinois State Psychiatric Institute. Levi Ramseur, a correctional officer at Cook County Jail, testified that on July 7, 1977, at about 3:30 a.m., he prevented an escape by defendant from the jail compound. Herbert Martin, a guard at Cook County Jail, testified that on November 25, 1978, defendant and seven other inmates armed with homemade knives, jumped Martin and handcuffed him then locked him up during an escape attempt. Defendant escaped for two days but the other seven inmates were recaptured. James Montgomery, a correctional officer at Cook County Jail stated that while searching the roof at the jail on November 27, 1978, he found defendant hiding in an airvent. Chicago Police Officer Harry Gaines testified that on October 1, 1976, he and his partner placed defendant under arrest after a shootout following his emergence from a currency exchange.

Defense counsel moved to strike all testimony by the correctional officers and for a mistrial because such testimony was evidence of other crimes and was not probative or relevant. The trial court denied both motions. The court also denied a motion in limine made by defense counsel to prevent any reference to a book which allegedly contained two hacksaw blades found in the defendant's possession during the pendency of the trial. Defendant argued there was no showing that he knew hacksaw blades were inside the book and any probative effect of such evidence would be outweighed by severe prejudice.

Clifton Bates, a correctional officer at Cook County Jail, thereafter

testified on rebuttal that on the previous day, April 24, 1980, defendant returned to the maximum security lockup after spending the day in court pursuant to the instant trial, carrying a book. A jail guard ripped off the back covers of the book. Inside were two hacksaw blades. On cross-examination Officer Bates stated that he previously had not seen defendant carrying that book. Defendant told Bates that the book belonged to Francis Scott, an inmate who shared a cell with defendant and denied knowing that the hacksaw blades were in the book.

Dr. Edward Kelleher, a psychiatrist, testified on defense surrebuttal. He examined defendant on October 9, 1974; February 24, 1975; October 16, 1976; November 3, 1977; and November 15, 1977. He also examined police and psychological reports. In October, 1974 it was Dr. Kelleher's opinion that defendant was schizophrenic and suffered from the same illness in February 1975. On cross-examination, his opinion was that as of November 15, 1977, defendant was able to appreciate the criminality of his acts and he was able to conform his behavior to the requirements of the law as of the day of the murders. In 1977, Dr. Kelleher reduced to writing his findings that defendant was sane in 1974.

I

Defendant first argues that it was reversible error to admit rebuttal evidence concerning his escape attempts because he was unfit to stand trial at the time of those incidents and such evidence grossly prejudiced his right to a fair trial. According to defendant, the court's reason for admitting the evidence, to allow rebuttal of defense testimony to the effect that defendant was legally insane during the murder by permitting evidence of defendant having engaged in rational acts subsequent thereto, was not well founded. He claims that he cannot be deemed to have possessed guilty knowledge where he was found to have been unfit to stand trial for six years following his arrest. Defendant objects further to the admission of Officer Gaines' testimony regarding the exchange of gunfire between Gaines and defendant after his emergence from the currency exchange, and defendant's subsequent arrest, as prohibited evidence of other crimes. He also argues that the rebuttal testimony, since it concerned matters which occurred subsequent to the murders, was not relevant to defendant's mental state on that date. Defendant also claims that evidence of his possession during the trial of a book containing hacksaw blades was not relevant to his mental state on the day of the murders and should have been excluded.

■■ Admission in evidence of rebuttal evidence testimony rests within the discretion of the trial court. (*People v. Veal* (1978), 58 Ill. App. 3d 938, 966, 374 N.E.2d 963, *cert. denied* (1979), 441 U.S. 908, 60 L. Ed. 2d 378, 99 S. Ct. 2001.) Testimony concerning defendant's escape and attempted

escapes tended to explain defendant's psychiatric evidence with regard to the periods of lucidity referred to by Dr. Tuteur. It was also intended to show that just two days before trial, defendant was found to possess the means of yet another escape attempt, the book-bound hacksaw blades, contrary to Dr. Tuteur's opinion that defendant was at that time schizophrenic. The attempts at escape and actual escapes could have been regarded by the jury as evidence of defendant's capacity to act in a rational and calculating manner during a period in which he was allegedly schizophrenic; when considered along with other evidence, it constituted strong presumptive evidence of defendant's guilty knowledge (*People v. Gambino* (1957), 12 Ill. 2d 29, 32, 145 N.E.2d 42; *People v. Armstrong* (1976), 43 Ill. App. 3d 586, 357 N.E.2d 84), and was, therefore, proper rebuttal. In *Armstrong*, that defendant first sought to hide from police, as in the instant case, and later escaped as were the circumstances here. There the court stated (43 Ill. App. 3d 586, 595): "The attempt of the defendant to avoid arrest by hiding under a bed and his actual escape from the custody of the police constitute strong presumptive evidence of his guilty knowledge which impelled him to flee." Possession of the means of escape, such as hacksaw blades, stands upon the same footing as evidence of escape or attempted escape. (*People v. Yonder* (1969), 44 Ill. 2d 376, 392, 256 N.E.2d 321, *cert. denied sub nom. Guido v. Illinois* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094. See, also *People v. Neiman* (1967), 90 Ill. App. 2d 337, 344-45, 232 N.E.2d 805, setting forth rationale for the rule.) No error is found in the admittance of this evidence. *People v. Carbona* (1975), 27 Ill. App. 3d 988, 1005, 327 N.E.2d 546, *cert. denied* (1976), 424 U.S. 914, 41 L. Ed. 2d 319, 96 S. Ct. 1114.

 With regard to the testimony of Officer Gaines of events during the shootout after defendant was observed leaving the currency exchange, to be noted is the fact that there was no connection made by the State with respect to how this evidence tended to prove defendant's sanity on the date of the crimes under consideration here. Evidence of other crimes is generally inadmissible, exceptions being limited to the establishment of motive, common design, identity, intent, knowledge or a fact material to an issue on trial. (*People v. Brunning* (1981), 95 Ill. App. 3d 673, 676, 420 N.E.2d 587; *People v. Scott* (1968), 100 Ill. App. 2d 473, 241 N.E.2d 579.) No such exception appears applicable to the facts of this case and the evidence should have been excluded. Defense counsel made no objection to the admission of this evidence, which ordinarily constitutes waiver. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) Defendant also failed to preserve this issue in his motion for a new trial, which again triggers the waiver doctrine as to this point. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Defendant does not deny having committed the murders with which he is charged here; he raises the defense of

insanity. Since the asserted error of admitting evidence of other crimes did not tend to negate that defense, it cannot be deemed to have influenced or prejudiced the jury in its consideration of defendant's asserted insanity so as to invoke the plain error rule. Ill. Rev. Stat. 1979, ch. 110A, par. 615(a); *People v. Carlson.*

## II

It is next claimed by defendant that the trial court erred in failing to give, on its own motion, a jury instruction explaining the consequences of a verdict of not guilty by reason of insanity. He argues that a jury is persuaded to convict despite a plea of insanity where it is not aware that finding a defendant not guilty by reason of insanity would result in a hearing to determine if he requires hospitalization. He contends that failure to so instruct the jury constitutes a substantial defect which cannot be waived by defendant's failure to have tendered such instruction to the court; therefore, the court should have *sua sponte* required the instruction. (*People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513), and relies upon *People v. Smith* (1976), 41 Ill. App. 3d 776, 354 N.E.2d 546. *Smith,* however, lends no support to his position. Purporting to follow Federal law, *Smith* held that submission of the verdict form of "not guilty by reason of insanity" without an instruction as to the consequences of such a verdict does not constitute reversible error where no such instruction was tendered to the court. The *Smith* court declined to hold whether the instruction should be given *sua sponte* where defendant has a "strong" insanity defense.

Cases cited by the defense from other jurisdictions do not specifically reach the question of whether such an instruction should be given absent defendant's, or the jury's, request, except for *Lyles v. United States* (D.C. Cir. 1957), 254 F. 2d 725, which held that such an instruction should always be given even absent such a request. Parenthetically, the court in *Smith* refused to follow *Lyles.* Further, in *People v. Meeker* (1980), 86 Ill. App. 3d 162, 170, 407 N.E.2d 1058, the trial court's refusal to give such an instruction, even when tendered by the defendant, was held not to have constituted reversible error. The *Meeker* court reasoned that such an instruction is not allowed by most jurisdictions, and that Illinois, unlike many jurisdictions that do allow the instruction, does not require mandatory institutionalization following a verdict of not guilty by reason of insanity. Further, the court stated such an instruction could result in a compromise verdict. We find the foregoing reasons persuasive. Accord, *People v. La Fiura* (1981), 92 Ill. App. 3d 714, 415 N.E.2d 1365.

## III

Defendant next identifies error in prosecutorial conduct committed

during closing argument, which is claimed to have been improper, inflammatory, and without basis in the record. These include the prosecutor's repeated statement that defendant is "trying to walk out that door"; the prosecutor's reference to defendant's "using the system" to escape responsibility for his crime; the prosecutor's suggestion that defendant's insanity defense was not advanced until he met other lawyers and prisoners; and, the prosecutor's reference to a notorious case involving John Wayne Gacy and 33 murders.

The State argues that comments made regarding defendant walking out the door were invited by defendant, who raised the issue of self-defense in his argument and in an instruction to the jury. The prosecutor in closing argument may dwell upon the results of a crime and comment upon its effect on the community. *People v. Johnson* (1979), 73 Ill. App. 3d 431, 435, 392 N.E.2d 587; see also *People v. Bost* (1980), 80 Ill. App. 3d 933, 956, 400 N.E.2d 734.

■■ The State claims that the prosecutor's comment that defendant's insanity defense was not advanced until he met other prisoners and his attorney was a reasonable inference drawn from the following evidence: testimony describing defendant as behaving rationally during questioning; evidence of escape attempts in which he behaved rationally; Dr. Tuteur's statement in his first report that the possibility of malingering was considered; and, testimony from another psychiatrist which described defendant as consciously controlling his psychosis. Although the prosecutor's observations had been better left unsaid, we cannot say that they materially contributed to defendant's conviction here, as was the case in *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68, where a conviction was reversed by reason of prosecutorial comments which went far beyond any evidence in the record in which they could have found legitimate support.

■■ Reference to John Wayne Gacy is claimed by the State to have been in response to defendant's cross-examination of police investigators regarding the small number of murder victims whose bodies had been dismembered and to defendant's opening statement and closing argument in which he suggested the murders were so bizarre that defendant had to be insane. Reference to a well-known case in closing argument is not improper where the comments do not inflame the jury or suggest a personal similarity between defendant and another criminal. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 324, 379 N.E.2d 847; *People v. Tolefree* (1980), 85 Ill. App. 3d 844, 848, 407 N.E.2d 604.) In *People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 1125-26, 408 N.E.2d 1098, an obvious reference to John Wayne Gacy was also made. There the prosecutor commented that every time a vicious crime is committed, defendant's neighbors testify that he is a wonderful person and a good

citizen, that he used to dress up as a clown and was a member of the Junior Chamber of Commerce. The court there held, as we hold here, that the State cannot be said to have attempted a comparison between that notorious case and the case at bar. If anything, the comments made in the instant case, that "it doesn't mean he was crazy just because he cut up the bodies. John Gacey [*sic*] buried thirty-three of them under his home," is less suggestive of comparison than the comments in *Szerletich*. We find no basis for reversal in those remarks.

### IV

■■ Defendant next contends that he was not proved sane beyond a reasonable doubt. We have analyzed the psychiatric and other evidence set forth in the body of this opinion from this perspective and find ample support for the jury's verdict beyond a reasonable doubt.

For the reasons set forth above, the conviction of defendant by the jury in this case cannot be disturbed. Accordingly, the verdict, conviction and sentences must be affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.